Filed 4/16/18; partial pub. order 5/11/18 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER ALEXANDER et al., | D071001 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2014-00016257-CU-MM-CTL) |
| SCRIPPS MEMORIAL HOSPITAL LA JOLLA et al., | |
| Defendants and Respondents. | |

APPEAL from judgments of the Superior Court of San Diego County, Randa Trapp, Judge.  Affirmed in part; reversed in part.

Benjamin Cheeks and Christopher M. Alexander for Plaintiffs and Appellants.

Cole Pedroza, Kenneth R. Pedroza and Matthew S. Levinson for Defendants and Respondents Gustavo Lugo, Jr., Preeti Mehta, Donald J. Ritt and Marie P. Shieh; Creason & Aarvig and James A. Creason for Defendant and Appellant Gustavo Lugo, Jr.; LaFollette, Johnson, Dehaas, Fesler & Ames and James J. Wallace II for Defendant and Respondent Preeti Mehta; Neil Dymott and Robert W. Frank for Defendant and

Respondent Donald J. Ritt; Hegeler & Anderson and Barton H. Hegeler for Defendant and Respondent Marie P. Shieh.

Higgs Fletcher & Mack, John Morris, William A. Low, Kathryn A. Martin and Rachel E. Moffitt for Defendants and Respondents Scripps Memorial Hospital La Jolla, Shawn Evans, Ayana Boyd-King, Ernest Pund, Charles Ettari and Karen Knight.

This case raises issues concerning the legal obligations imposed on health care providers when a patient's health care directives conflict with the providers' opinions that the requested care would be medically ineffective and may cause harm. Elizabeth Alexander, a 70-year-old woman suffering from end-stage terminal pancreatic cancer, died four days after she was transferred from a skilled nursing facility to Scripps Memorial Hospital La Jolla (Scripps). Elizabeth had an advance health care directive stating she wanted all measures taken to prolong her life. Defendants declined to provide Elizabeth with certain advanced life support measures on the basis that such measures would have been ineffective and caused her to suffer further harm.

After Elizabeth's death, her estate (Estate) and children, Clenton Alexander, Christopher Alexander, and Jacquelyn McDermet (together, Plaintiffs),[1] sued Scripps and numerous medical professionals, alleging Elizabeth died after defendants failed to provide the life-sustaining treatment and comfort care requested in her advance health

---

[1] For purposes of clarity, we refer to Elizabeth Alexander, Clenton Alexander, and Christopher Alexander by their first names.

2

care directive. The trial court resolved Plaintiffs' claims in favor of Defendants either by sustaining demurrers or granting summary judgment. For reasons we shall explain, we affirm except for an award of expert fees to one physician defendant against Christopher and McDermet. We also deny Plaintiffs' request for judicial notice.[2]

OVERVIEW

Plaintiffs sued Scripps and nine medical professionals involved in Elizabeth's care and treatment. Four of the physician defendants were directly involved in Elizabeth's care: Dr. Donald Ritt (palliative care), Dr. Gustavo Lugo (hospitalist), Dr. Preeti Mehta (internal medicine), and Dr. Marie Shieh (oncologist). The remaining physician defendants were members of Scripps's Appropriate Care Committee, a team of volunteer physicians who provide recommendations as to whether certain treatment is appropriate for a patient (Appropriate Care Committee). The members of the Appropriate Care Committee were Dr. Shawn Evans (chief of staff at Scripps), Dr. Ayana Boyd-King, Dr. Ernest Pund, and Dr. Charles Ettari. As a treating physician, Dr. Lugo also participated in the Appropriate Care Committee for Elizabeth's case. Plaintiffs also sued Karen

_____

[2]    Plaintiffs requested we take judicial notice of (1) a California Law Revision Commission recommendation regarding "Health Care Decisions for Adults Without Decisionmaking Capacity," and (2) a document from the California Medical Association, entitled "Legal and Ethical Principles Applicable to Requests for Medically Ineffective or Non-Beneficial Treatment." These documents were not presented to the trial court. Plaintiffs offer no explanation for their failure to request judicial notice in the trial court and we discern no "exceptional circumstances" that would justify deviating from the general rule that reviewing courts do not take judicial notice of documents not presented to the trial court. (*Vons Companies, Inc. v. Seabest Foods, Inc*. (1996) 14 Cal.4th 434, 444, fn. 3.)

3

Knight, a nurse who helped facilitate Elizabeth's transfer to another facility based on Christopher's request.[3]

After Plaintiffs filed their initial complaint, the trial court sustained several demurrers, which led to Plaintiffs' operative fourth amended complaint. In the operative complaint, Plaintiffs asserted claims against Defendants for violations of five statutes within the Health Care Decisions Law (Probate Code, § 4600 et seq.),[4] elder abuse, professional negligence, wrongful death, negligent misrepresentation, and negligent infliction of emotional distress. Many of Plaintiffs' claims were based on allegations that Defendants did not provide Elizabeth with advanced life support measures such as cardiopulmonary resuscitation (CPR), and adequate pain medication, nutrition and fluids. The parties engaged in extensive discovery over a three-year period.

Defendants moved for summary judgment on Plaintiffs' claims and supported their motions with expert declarations stating Defendants complied with the standard of care, did not violate the Probate Code, and did not cause Elizabeth injury or death. While these motions were pending, Plaintiffs sought to depose the Scripps Defendants and Dr. Ritt's expert, but the trial court denied that request. Thereafter, Plaintiffs opposed Defendants' summary judgment motions with declarations from their own expert, Dr. Laurence Boggeln. The trial court granted Defendants' summary judgment motions.

---

[3] We refer to Scripps; nurse Knight; and Drs. Evans, Boyd-King, Pund, and Ettari together as the Scripps Defendants. We refer to the Scripps Defendants together with Drs. Ritt, Lugo, Mehta, and Shieh as Defendants.

[4] Undesignated statutory references are to the Probate Code.

These rulings were largely based on the court's decision to sustain Defendants' objections to Dr. Boggeln's opinions on the basis that the opinions were conclusory, lacked foundation, and the expert failed to consider critical facts, including Elizabeth's end-stage terminal cancer. Further, the trial court found Defendants were immune from liability for alleged violations of the Health Care Decisions Law.

After the trial court granted Defendants summary judgment, the trial court awarded Defendants their costs, including expert fees under Code of Civil Procedure section 998. In total, the costs amounted to approximately $160,000.

On appeal, Plaintiffs contend the trial court erred in: (1) sustaining demurrers to their elder abuse claims; (2) refusing their request to depose a defense expert; (3) sustaining objections to their expert's declarations and overruling their objections to defense expert declarations; (4) finding Drs. Evans, Boyd-King, Ettari, and Pund (Appropriate Care Committee) did not owe Elizabeth a duty of care; (5) finding there was no triable issue of fact on their negligent misrepresentation claim; (6) finding Defendants were immune from liability and did not violate provisions of the Health Care Decisions Law; (7) denying their motion to reconsider the summary judgment rulings in favor of the Scripps Defendants and Dr. Ritt; (8) improperly awarding Defendants costs and expert fees; and (9) delaying depositions until the complaint was amended to name all of Elizabeth's known heirs.

We conclude the trial court properly sustained Defendants' demurrers to Plaintiffs' causes of action for elder abuse because Plaintiffs did not allege Defendants' conduct was sufficiently egregious to constitute elder abuse within meaning of the Elder Abuse and

5

Dependent Adult Civil Protection Act (Elder Abuse Act) (Welf. & Inst. Code, § 15600 et seq.), and Plaintiffs did not meet the pleading requirements for their elder abuse claims. Plaintiffs' allegations, at best, stated a claim for professional negligence.

We also conclude the trial court properly granted Defendants summary judgment. On Plaintiffs' professional negligence and wrongful death claims, they could not defeat summary judgment because their expert did not set forth sufficient reasoning or explanation for his opinion that Defendants' breaches of the standard of care and violations of the Probate Code *caused* Elizabeth injury or death. Plaintiffs' negligent misrepresentation claims failed because the statements they relied upon were not positive assertions by Defendants, and Plaintiffs did not justifiably rely on Defendants' statements.

Concerning Plaintiffs' causes of action for Probate Code violations, we find Defendants were immune from liability under section 4740 for alleged violations of sections 4730 concerning communication of health care decisions; 4732 concerning recordation of information about a patient's capacity; 4736 concerning a health care provider's or institution's duties upon declining to comply with a patient's health care instructions; and 4742, subdivision (b) concerning liability for concealing or coercing or fraudulently inducing an individual to change an advance health care directive. On Plaintiffs' remaining Probate Code argument, contending the Scripps Defendants and Dr. Ritt violated section 4731, subdivision (a) by not requesting and maintaining Elizabeth's advance health care directive, we conclude section 4731 does not apply to the Scripps Defendants because they were not supervising health care providers within the meaning

6

of the Health Care Decisions Law and, as to Dr. Ritt, Plaintiffs did not raise a triable issue of fact concerning whether Dr. Ritt intentionally violated the statute.

Lastly, we conclude the trial court erred in holding Christopher and McDermet responsible for Dr. Ritt's expert fees under Code of Civil Procedure section 998 because Dr. Ritt did not serve them with offers to compromise. Accordingly, we reverse the judgment in favor of Dr. Ritt to the extent it awards those fees. In all other respects, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Elizabeth's Hospitalization*

In June 2012, a doctor informed Elizabeth she had stage four pancreatic cancer and there was no cure. Elizabeth's options included palliative chemotherapy, supportive care, or hospice. She stated she wanted to continue fighting and elected to undergo palliative chemotherapy. Elizabeth's cancer was very aggressive and had spread to her liver and bones.

In January 2013, Elizabeth was admitted to Emeritus Skilled Nursing Facility (Emeritus) because she could no longer care for herself. Elizabeth had an advance health care directive in which she elected to have all measures taken to prolong her life. Elizabeth designated Christopher as the person who could make health care decisions for her in the event she was unable to make those decisions. Christopher completed a Physician Orders for Life Sustaining Treatment (POLST) form, indicating he wanted Elizabeth to be "full code," meaning she would receive CPR and full medical treatment.

7

On February 15, 2013, Elizabeth went to the emergency room at Scripps for placement of a feeding tube because she was malnourished. She was awake and alert, but was weak and had difficulty speaking. After a physician placed the feeding tube, Elizabeth returned to Emeritus.

On February 17, 2013, Dr. Aboo Nasar, the medical director of Emeritus, evaluated Elizabeth because her health had significantly deteriorated since she was first admitted to the facility. Elizabeth could not communicate with Dr. Nasar and was malnourished and weak. Dr. Nasar described Elizabeth as "quite terminal" and expected her to die within days. Dr. Nasar discussed Elizabeth's condition with Christopher, who stated he wanted everything done to prolong Elizabeth's life. Dr. Nasar believed treating Elizabeth as "full code" would cause her additional pain and suffering.

On February 18, 2013, Dr. Nasar discharged Elizabeth to Scripps for evaluation. He did not expect her to return to Emeritus as he believed her death was imminent. A licensed vocational nurse filled out a nursing home discharge form for Elizabeth, indicating (apparently in error) Elizabeth did not "have a condition or chronic disease that may result in a life expectancy of less than 6 months." That designation required physician documentation, but there was no evidence that a physician agreed with the nurse's determination of Elizabeth's prognosis.

Elizabeth presented to the emergency room at Scripps via ambulance. Dr. Christopher Wiesner saw Elizabeth in the emergency room and noted she was alert, but minimally verbally responsive. Christopher informed Dr. Wiesner that Elizabeth wished to have all medical care, including full resuscitation and a feeding tube. Scripps had a

8

copy of Elizabeth's POLST. Additionally, Christopher informed Dr. Wiesner that Elizabeth had an advance health care directive. In the emergency room, Elizabeth received hydromorphone for pain and saline.

Dr. Wiesner admitted Elizabeth to the hospital for consultation with oncology or palliative care. A nurse noted in Elizabeth's medical record that Elizabeth had an advance health care directive and that a copy of it was in her chart.

Dr. Lugo, the hospitalist, saw Elizabeth when she was admitted to Scripps on February 18, 2013. He noted she looked near terminal and emaciated with severe and obvious signs of malnutrition. Dr. Lugo's treatment plan stated comfort measures were the primary goal to ease Elizabeth's suffering. Although Dr. Lugo determined tube feedings would be futile and would prolong Elizabeth's suffering, he ordered this care be provided.

Dr. Shieh, a consulting oncologist, evaluated Elizabeth on February 18, 2013. Dr. Shieh noted Elizabeth was "post palliative chemotherapy and radiation. She has now had a progressive decline in her functional status, and there [was] evidence of moderate progression of disease." Dr. Shieh spoke with Christopher, who informed her Elizabeth was a fighter and would want to continue any possible available therapies. Dr. Shieh informed Christopher that "given [Elizabeth's] poor performance status, and her liver failure, . . . there really [were] no other safe therapies at [that] time."

Dr. Ritt, a member of the palliative care team, also evaluated Elizabeth on February 18, 2013. Dr. Ritt noted Elizabeth was "clearly an individual who should not undergo aggressive resuscitation[;] cardiac compression, and/or intubation would not be

9

appropriate. She is frail, debilitated, and has some metastasis that is extensive." Dr. Ritt prepared orders for tube feedings and pain medications. He also entered a do not resuscitate (DNR) order, but did not tell Christopher of his action. However, according to Dr. Ritt, he had a conversation with Christopher on February 18, 2013, that relayed the substance of the DNR order. Specifically, Dr. Ritt explained that maintaining Elizabeth at full code status, including providing CPR and other similar measures, would cause her to suffer additional harm and any care that would cause further harm and suffering could not be performed.

Dr. Ritt spoke with McDermet about a conversation he had with Christopher about Elizabeth's code status. During the conversation with McDermet, Dr. Ritt informed her that he did not agree with the family's desire to engage in life-prolonging measures because Elizabeth was terminally ill.

Dr. Ritt contacted Dr. Evans, chief of staff at Scripps, and initiated steps to involve Scripps's Appropriate Care Committee, comprised of Drs. Evans, Pund, Ettari, Boyd-King and Lugo, the treating physician, in Elizabeth's case.

On February 19, 2013, Elizabeth received a fentanyl patch for her pain. She was also cleared for transfer back to Emeritus as soon as possible with her feeding tube in place. However, later that day, Dr. Ritt placed a hold on Elizabeth's transfer based on information from nurse Knight that Emeritus would not accept the patient back at that time. Emeritus would not accept Elizabeth's transfer if her family wanted her to have a full resuscitation or full code order in place. Christopher was not aware Dr. Ritt had placed a hold on Elizabeth's transfer.

10

The Appropriate Care Committee met on February 20, 2013, to discuss the incongruence between Elizabeth's family's wishes for her to be "full code" status and the recommendations of treating doctors that such treatment would be medically ineffective and may cause harm. The Appropriate Care Committee reviewed Elizabeth's medical records, including opinions from Drs. Wiesner, Shieh, Ritt, and Lugo that Elizabeth should not undergo advanced life support measures and CPR because those efforts would be futile. The committee noted Elizabeth's condition had deteriorated while in the hospital. The committee concluded that appropriate care included preserving Elizabeth's mental and physical comfort, such as providing oxygen, IV fluids, pain medications, and palliative care. Additionally, the Appropriate Care Committee was aware of Elizabeth's family's preference to continue tube feeding and did not object to it because it was not necessarily harmful to her. The Appropriate Care Committee recommended against advanced life support measures (i.e., CPR, intubation, and defibrillation) because those measures would have been ineffective.

Members of the Appropriate Care Committee spoke with Christopher about Elizabeth's condition and their recommendations for appropriate care. Christopher expressed he understood Elizabeth's death was imminent and she had no opportunity for survival. However, Christopher maintained Elizabeth's advance health care directive should be followed and he was not willing to endorse anything to the contrary. The Appropriate Care Committee members explained that doctors could not embark on ineffective care. Christopher requested Elizabeth be transferred to another facility. Thus,

11

the committee informed Christopher it would make efforts to transfer Elizabeth, provided the transfer did not harm her.

Thereafter, Knight contacted Christopher to facilitate Elizabeth's transfer. Christopher reiterated he did not agree with Elizabeth's DNR code status. Knight recommended Christopher contact Elizabeth's insurance to identify a covered facility and doctor who would accept her transfer.

On February 20, 2013, Dr. Lugo prescribed Elizabeth 1.5 milligrams of hydromorphone every two hours, as needed for pain. Later that day, Dr. Ritt increased Elizabeth's hydromorphone to two milligrams every two hours, as needed for pain, and prescribed lorazepam to ease her discomfort during the dying process. Dr. Ritt did not discuss the administration of lorazepam with Christopher.

Dr. Mehta (internal medicine) also saw Elizabeth on February 20, 2013. Dr. Mehta did not provide Elizabeth with intravenous fluids that day because Elizabeth was edematous, meaning she had an accumulation of excess fluid in cells, tissues, or body cavities. Further, Dr. Mehta decreased Elizabeth's tube feedings because she determined further nutrition was unnecessary and could be causing Elizabeth additional pain. Dr. Mehta discussed this change with Elizabeth's family. Christopher reiterated he wanted Elizabeth to be a full code patient.

Dr. Mehta reduced Elizabeth's hydromorphone to one milligram every two hours, as needed for pain. Elizabeth received two milligrams of hydromorphone at 2:02 p.m. and then one milligram at 11:47 p.m. She did not receive additional hydromorphone between that time, but did have a continuous release fentanyl patch for pain. Dr. Mehta

12

observed Elizabeth in pain at 4:00 p.m. that day.  The plan was for Elizabeth to be discharged to Emeritus the following morning, if possible.

Dr. Ritt saw Elizabeth on February 21, 2013.  Elizabeth did not receive artificial nutrition that day.  Knight was able to arrange Elizabeth's transfer back to Emeritus at 4:00 p.m. on February 21, 2013.  Elizabeth died an hour and a half before her scheduled transfer.  Consistent with the Appropriate Care Committee's recommendation and the DNR order in place, CPR was not initiated on Elizabeth.  Dr. Mehta prepared a death report on Elizabeth and listed the causes of death as cardiorespiratory arrest related to progressive pancreatic cancer with metastasis to the liver, cancer cachexia, anemia, and severe malnutrition.

*The Lawsuit*

In May 2014, Clenton, on behalf of himself and the Estate, filed an action against Defendants, alleging 16 causes of action.  In August 2015, after multiple rounds of demurrers, Plaintiffs filed their operative fourth amended complaint, alleging violations of the Probate Code, elder abuse, professional negligence, wrongful death, negligent misrepresentation, and negligent infliction of emotional distress.

Between March 2013 and March 2016, the parties engaged in discovery.  During that time, Plaintiffs deposed 10 medical professionals and individuals designated as persons most knowledgeable for Scripps.  Defendants produced documents, including medical records and billing records.

In March 2016, the Scripps Defendants and Dr. Ritt moved for summary judgment or, in the alternative, summary adjudication.  They argued Plaintiffs could not prove the

13

essential elements of negligence, including causation; there was no evidence the Scripps Defendants and Dr. Ritt violated the Probate Code; the Scripps Defendants and Dr. Ritt were immune from liability under the Probate Code; and Plaintiffs could not establish negligent misrepresentation and negligent infliction of emotional distress. The Scripps Defendants also argued the Appropriate Care Committee members did not owe Elizabeth a duty of care. The Scripps Defendants and Dr. Ritt supported their motions with an expert declaration from Dr. Eric Roeland regarding whether they complied with the standard of care and contributed to Elizabeth's death or caused her injury.

In April 2016, Drs. Lugo, Mehta, and Shieh moved for summary judgment or, in the alternative, summary adjudication. They made arguments similar to those asserted by the Scripps Defendants and Dr. Ritt, and each defendant supported his or her motion with an expert declaration consistent with the opinions Dr. Roeland offered.

In May 2016, Plaintiffs opposed the Scripps Defendants' and Dr. Ritt's summary judgment or summary adjudication motions. Plaintiffs supported their opposition with a May 2016 expert declaration from Dr. Boggeln, who opined the care and treatment Defendants provided to Elizabeth failed to comply with the standard of care and Probate Code, and was a substantial factor in causing Elizabeth injury and death. The Scripps Defendants and Dr. Ritt objected to Dr. Boggeln's declaration on numerous grounds, including that Dr. Boggeln's opinions were conclusory and lacked factual support.

In June 2016, the trial court heard arguments on the Scripps Defendants' and Dr. Ritt's summary judgment or summary adjudication motions and their objections to Dr. Boggeln's declaration. During the hearing, the court questioned Dr. Boggeln's opinions

14

because he provided little explanation for his conclusions and relied on a prognosis determination from a nurse at Emeritus that was not supported with physician documentation. Plaintiffs offered, "[t]o the extent that the Court still has concerns regarding [Dr. Boggeln's] declaration, we're happy to submit an amended declaration to address the Court's concerns." The trial court did not request a supplemental declaration, and Plaintiffs did not request a continuance.

The trial court granted the Scripps Defendants' and Dr. Ritt's summary judgment motions and sustained their objections to all of the opinions in Dr. Boggeln's declaration. The court concluded there was no triable issue of fact on whether the Scripps Defendants and Dr. Ritt violated the standard of care and caused Elizabeth injury or death; the Appropriate Care Committee members did not owe Elizabeth a duty of care; the Scripps Defendants and Dr. Ritt were immune from liability for alleged statutory violations of the Probate Code; and there was no competent evidence to support Plaintiffs' other claims.

After the trial court granted the Scripps Defendants' and Dr. Ritt's summary judgment motions, Plaintiffs opposed Drs. Lugo, Mehta, and Shieh's summary judgment or summary adjudication motions and filed amended declarations from Dr. Boggeln in support of their oppositions. Dr. Boggeln reached the same opinions as he had in his earlier declaration. Drs. Lugo, Mehta, and Shieh objected to Dr. Boggeln's amended declarations.

In July 2016, the trial court granted Drs. Lugo, Mehta, and Shieh's summary judgment motions and sustained their objections to Dr. Boggeln's declarations. The trial

15

court granted Drs. Lugo, Mehta, and Shieh's summary judgment motions on the same grounds as it had for the Scripps Defendants and Dr. Ritt.

The trial court entered judgments in favor of Defendants. After Plaintiffs' motions to tax costs, the trial court awarded Defendants costs, totaling $160,895.92. Specifically, the court awarded $43,302.51 to the Scripps Defendants, $28,237 to Dr. Lugo, $32,501.22 to Dr. Mehta, $28,801.71 to Dr. Ritt, and $28,053.48 to Dr. Shieh.

## DISCUSSION

### I. *Demurrer Rulings*

A. <u>Background</u>

After the trial court sustained in part and overruled in part Defendants' demurrer to Plaintiffs' second amended complaint, Plaintiffs filed a third amended complaint, alleging 12 causes of action against each Defendant. As relevant here, the trial court sustained without leave to amend Defendants' demurrer to Plaintiffs' cause of action for elder abuse based on neglect, and sustained with leave to amend the demurrer to a cause of action for elder abuse based on financial abuse.

In August 2015, Plaintiffs filed the operative fourth amended complaint that included a cause of action for financial elder abuse. The trial court sustained Defendants' demurrer to the elder abuse cause of action without leave to amend and granted their associated motion to strike enhanced penalties and punitive damages.

B. <u>Standard of Review</u>

We review an order sustaining a demurrer de novo, exercising our independent judgment as to whether a cause of action has been stated as a matter of law. (*Moore v.*

16

*Regents of University of California* (1990) 51 Cal.3d 120, 125.) It "is error for a trial court to sustain a demurrer [if] the plaintiff has stated a cause of action under any possible legal theory." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967.) In determining whether the pleading states a viable cause of action, we deem the factual allegations to be true, but disregard contentions, deductions, and legal conclusions. (*Hill v. Roll Internat. Corp.* (2011) 195 Cal.App.4th 1295, 1300.)

If "a demurrer is sustained without leave to amend, [we] must determine whether there is a reasonable probability that the complaint could have been amended to cure the defect; if so, [we] will conclude that the trial court abused its discretion by denying the plaintiff leave to amend. [Citation.] The plaintiff bears the burden of establishing that it could have amended the complaint to cure the defect." (*Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1035.)

C. <u>Elder Abuse Based on Neglect and Physical Abuse</u>

In their third amended complaint, Plaintiffs alleged Defendants committed elder abuse by neglecting and physically abusing Elizabeth. Plaintiffs contend the trial court erred in sustaining Defendants' demurrers to the elder abuse claim. Specifically, Plaintiffs argue the trial court ignored and disregarded allegations in their third amended complaint that Defendants " 'recklessly failed to provide medical care for [Elizabeth's] physical and mental health needs' "; " 'recklessly failed to protect [Elizabeth] from health and safety hazards' "; " 'recklessly abandoned [Elizabeth] by recklessly deserting and willfully forsaking [Elizabeth] while they had care and custody of [her] under circumstances in which a reasonable person would continue to provide care and

17

custody' "; and "recklessly 'held [Elizabeth's] transfer to a facility that would provide life-sustaining treatment, administered drugs to hasten [Elizabeth's] demise without her or her representative's consent, provided [Elizabeth] with less than 3 tablespoons of IV fluids per day for two days and even less on the third day, withheld from [Elizabeth] any feeding tube nutrition for a day, and failed to provide [Elizabeth] pain medications for more than 10 hours.' " Plaintiffs argue these allegations sufficiently pleaded a claim for elder abuse based on neglect and physical abuse under the Elder Abuse Act. We disagree.

### 1. *Legal Principles*

"The Elder Abuse Act makes certain enhanced remedies available to a plaintiff who proves abuse of an elder, i.e., a 'person residing in this state, 65 years of age or older.' " (*Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 404 (*Carter*).) "The Elder Abuse Act's heightened remedies are available only in limited circumstances. A plaintiff must prove, by clear and convincing evidence, that a defendant is liable for either physical abuse . . . or neglect . . . , and that the defendant committed the abuse with 'recklessness, oppression, fraud, or malice.' " (*Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148, 156 (*Winn*).) The heightened remedies available under the Elder Abuse Act include not only recovery of attorney fees and costs, "but also exemption from the damages limitations otherwise imposed by Code of Civil Procedure section 377.34. Unlike other actions brought by a decedent's personal representative or successor in interest, claims under the Act allow for the recovery of damages for predeath pain, suffering, and disfigurement." (*Id.* at p. 155.)

18

Abuse under the Elder Abuse Act includes physical abuse, neglect, and "[t]he deprivation by a care custodian of goods or services that are necessary to avoid physical harm or mental suffering."  (Welf. & Inst. Code, § 15610.07.)  Neglect is "[t]he negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." (*Id.,* § 15610.57, subd. (a)(1).)  Neglect includes "[f]ailure to provide medical care for physical and mental health needs."  (*Id.,* § 15610.57, subd. (b)(2).)

" '[N]eglect' within the meaning of Welfare and Institutions Code section 15610.57 covers an area of misconduct distinct from 'professional negligence.'  As used in the [Elder Abuse] Act, neglect refers not to the substandard performance of medical services but, rather, to the 'failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations.'  [Citation.]  Thus, the statutory definition of 'neglect' speaks not of the *undertaking* of medical services, but of the failure to *provide* medical care."  (*Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 783 (*Covenant Care*).)  The Elder Abuse Act does not "apply *whenever* a doctor treats any elderly patient.  Reading the act in such a manner would radically transform medical malpractice liability relative to the existing scheme."  (*Winn, supra*, 63 Cal.4th at p. 163.)  "[T]he facts constituting the neglect and establishing the causal link between the neglect and the injury 'must be pleaded with particularity,' in accordance with the pleading rules governing statutory claims."  (*Carter, supra*, 198 Cal.App.4th at p. 407.)

19

## 2. *Plaintiffs' Allegations Were Insufficient to State a Claim for Elder Abuse Based on Neglect and Physical Abuse*

Reviewing Plaintiffs' third amended complaint in light of the foregoing legal principles, we conclude Plaintiffs did not allege Defendants did anything sufficiently egregious to constitute neglect or physical abuse within the meaning of the Elder Abuse Act. As we shall explain, although Plaintiffs alleged Defendants failed to facilitate Elizabeth's transfer to another facility and withheld pain medication, nutrition, and fluids, the third amended complaint is replete with references to the extensive medical care Elizabeth received during her four-day hospitalization. Taken as a whole, Plaintiffs' allegations are insufficient to state a cause of action for elder abuse within the meaning of the Elder Abuse Act. Unlike cases in which elder abuse is properly pleaded because the patient was abandoned or ignored for extended periods of time, here family members disagreed with the nature of care their mother was receiving. Disagreements between physicians and the patient or surrogate about the type of care being provided does not give rise to an elder abuse cause of action.

We begin by analyzing Plaintiffs' specific allegations. First, Plaintiffs generally asserted Defendants recklessly failed to provide Elizabeth medical care, recklessly failed to protect her from health and safety hazards, and recklessly abandoned her. Plaintiffs' general statements of recklessness are not sufficient to survive a demurrer to their elder abuse cause of action. (See *Carter, supra*, 198 Cal.App.4th at p. 410 [to avoid the sustaining of a demurrer for an elder abuse cause of action, a plaintiff must plead facts that show the conduct was reckless, not simply assert that it was reckless].)

20

Next, Plaintiffs relied on an allegation that Defendants recklessly withheld Elizabeth's transfer to another facility. Reviewing the allegations in the third amended complaint in their totality, Plaintiffs did not plead facts amounting to neglect or physical abuse regarding the transfer. Plaintiffs alleged that on February 19, 2013, physician's orders referenced Elizabeth was to be transferred to Emeritus, but Dr. Ritt put a hold on the transfer. The complaint states that the next day, the Appropriate Care Committee noted Dr. Lugo would advise Dr. Mehta of Elizabeth's imminent transfer. Further, the complaint alleges that later that same day, a Scripps administrator met with Christopher regarding Elizabeth's transfer, and Christopher's and the Scripps administrator's efforts to secure a transfer for Elizabeth to Emeritus were successful. These allegations do not assert Defendants egregiously withheld medical care or did anything else sufficiently egregious to constitute elder abuse because of the manner in which they handled Elizabeth's transfer. (*Covenant Care, supra*, 32 Cal.4th at p. 786 [elder abuse includes "egregious withholding of medical care"].) To the contrary, Plaintiffs' allegations show Scripps was working on the transfer with Christopher.

Lastly, Plaintiffs relied on allegations that Defendants administered drugs to Elizabeth to hasten her death and withheld nutrition, hydration, and pain medication. However, the third amended complaint is replete with allegations that Elizabeth regularly received pain medication, nutrition, and fluids. The allegations suggest Defendants provided Elizabeth with medical care throughout her hospitalization. (Compare *Carter, supra*, 198 Cal.App.4th at p. 408 [finding that where defendants provided patient with medical care, plaintiff's allegations that defendants failed to infuse proper antibiotics and

21

failed to locate proper size endotracheal tube were not sufficient to allege abuse or neglect under the Elder Abuse Act] with *Mack v. Soung* (2000) 80 Cal.App.4th 966 [plaintiffs adequately stated a cause of action for elder abuse where doctor concealed the existence of patient's medical condition, opposed her hospitalization, and abandoned the patient in her dying hour of need by giving notice of withdrawal as her physician].)

Although Plaintiffs may disagree with the frequency and quantity of the medication, hydration, and nutrition Defendants provided to Elizabeth, Plaintiffs' allegations do not constitute abuse or neglect within the meaning of the Elder Abuse Act. At most, Plaintiffs' allegations might constitute professional negligence. (*Carter, supra*, 198 Cal.App.4th at p. 408 [citing cases stating elder abuse is distinct from professional negligence].)

D. Elder Abuse Based on Financial Abuse

Plaintiffs contend the trial court erred in sustaining demurrers to the financial elder abuse claim in their fourth amended complaint. They argue their fourth amended complaint properly stated a claim for financial elder abuse based on allegations that Defendants engaged in a scheme to overbill Elizabeth for procedures and medications. We disagree.

1. *Legal Principles*

" 'Financial abuse' of an elder or dependent adult occurs when a person or entity does any of the following: [¶] (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both. [¶] (2) Assists in taking, secreting, appropriating, obtaining, or

22

retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.  [¶]  (3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence, as defined in Section 15610.70."  (Welf. & Inst. Code, § 15610.30.)

Claims under the Elder Abuse Act, including for financial elder abuse, must be pleaded with particularity.  (*Covenant Care, supra*, 32 Cal.4th at p. 790.)  Additionally, when a plaintiff alleges fraud, the plaintiff must plead specifically " '*facts* which "show how, when, where, to whom, and by what means" ' " the fraud was perpetrated.  (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645.)  A plaintiff must also allege who committed the fraud.  (*Ibid.*; see also *Carter, supra,* 198 Cal.App.4th at p. 410 ["plaintiffs' '[u]se of such terminology [as fraudulently and recklessly] cannot cure [the] failure to point out exactly how or in what manner the [Hospital has] transgressed.' "].)

2. *Plaintiffs' Allegations Were Insufficient to State a Financial Elder Abuse Claim*

Here, Plaintiffs' fourth amended complaint alleged Defendants "recklessly, wrongfully, in bad faith, and with intent to defraud took and assisted in the taking of property from [Elizabeth] by overbilling for procedures, billing for medications in doses higher than those allegedly administered, billing for medically unnecessary procedures, and billing for procedures that were likely never performed."  Plaintiffs provided some details regarding the alleged overbilling, including allegations that Defendants billed for medically unnecessary procedures, including an "ER Level IV and venipuncture" and billed for pain medications at doses inconsistent with medical records about the doses

23

actually administered. However, the allegations do not meet the standards required for pleading a claim of financial elder abuse with particularity.

Plaintiffs' overbilling allegations group all Defendants together without specifying who in particular overbilled or was responsible for the overbilling. Further, Plaintiffs did not allege how Defendants collectively engaged in a scheme to defraud Elizabeth, knew of each other's wrongful conduct, or how specific defendants encouraged or assisted in the overbilling. In short, standing alone, disputes concerning the accuracy of billing statements are insufficient to state a claim for financial elder abuse.

Plaintiffs had ample opportunity to cure the defects in the complaint. In sustaining Defendants' demurrer to Plaintiffs' financial elder abuse claim in the third amended complaint, the trial court provided Plaintiffs an opportunity to amend, noting "Plaintiffs allege [D]efendants overbilled but have not particularly pled facts to show how each improperly billed." Where, as here, Plaintiffs have not overcome their pleading deficiencies after multiple attempts, the trial court could reasonably conclude they were unable to do so.[5] (*Ruinello v. Murray* (1951) 36 Cal.2d 687, 690 [affirming denial of leave to amend after demurrer sustained to third amended complaint].)

_____

[5]     Embedded within Plaintiffs' argument that they sufficiently pleaded financial elder abuse, they briefly assert that in ruling on the demurrer to the fourth amended complaint, the trial court failed to consider a declaration they had submitted regarding Defendants' efforts to block discovery of billing records. In ruling on a demurrer, the trial court cannot consider facts outside those pleaded, except for facts judicially noticed. (*Mansdorf v. California Physicians' Service, Inc.* (1978) 87 Cal.App.3d 412, 415 [improper for a court to consider counsel's declaration in demurrer proceedings].)

     Additionally, in a single sentence, Plaintiffs argue the trial court erred by not addressing their elder abuse claims based on "abandonment" and "deprivation of care."

24

E.  The Trial Court Properly Struck Plaintiffs' Request for Punitive Damages and Enhanced Remedies

Plaintiffs argue this court should reverse the trial court's decision to strike their request for punitive damages and enhanced remedies.  However, Plaintiffs' claims for punitive damages and enhanced remedies were based solely on the Elder Abuse Act.  Based on our conclusion that Plaintiffs did not properly plead a claim for elder abuse, the trial court did not err in striking their punitive damages and enhanced remedies claims.

II.  *Plaintiffs' Request to Depose a Defense Expert*

Plaintiffs argue the trial court abused its discretion in refusing their request to depose defense expert Dr. Roeland prior to ruling on the Scripps Defendants' and Dr. Ritt's summary judgment motions.[6]  The decision whether to grant discovery is within the sound discretion of the trial court based on all the facts presented.  (*St. Mary Medical Ctr. v. Superior Court* (1996) 50 Cal.App.4th 1531, 1540 (*St. Mary*).)  As we shall explain, we conclude the trial court acted within its discretion.

---

Plaintiffs did not elaborate on their abandonment or deprivation of care claim or provide citations to the record.  "The absence of cogent legal argument or citation to authority allows this court to treat the contentions as waived."  (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 (*Falcone & Fyke*).)

[6]  On appeal, Plaintiffs argue the trial court abused its discretion in denying their request to depose *multiple* experts.  However, their motion to compel discovery sought only the deposition of one expert, Dr. Roeland.  Based on the fact that Plaintiffs did not request multiple expert depositions below, we limit our discussion to Plaintiffs' request to depose Dr. Roeland.  (*Santantonio v. Westinghouse Broadcasting Co*. (1994) 25 Cal.App.4th 102, 113 [arguments not asserted below are waived and will not be considered for the first time on appeal].)

Code of Civil Procedure section 2034.410 generally prohibits taking the deposition of an expert prior to the exchange of expert witness designations.  However, in *St. Mary*, the court found the parties should be allowed to depose an expert who supplies a declaration in support of or in opposition to summary judgment "under the proper circumstances."  (*St. Mary, supra*, 50 Cal.App.4th at p. 1540.)  The proper circumstances are "where there is a legitimate question *regarding the foundation of the opinion of the expert*."  (*Ibid*., italics added.)  "In reaching this conclusion[,] [the court] caution[ed] that the process should not be utilized to turn summary proceedings into mini-trials. . . . There must be objective facts presented which create a significant question regarding the validity of the affidavit or declaration which, if successfully pursued, will impeach the foundational basis of the affidavit or declaration in question."  (*Id*. at pp. 1540-1541.)

Here, it was undisputed that there had been no expert exchange at the time Plaintiffs moved to compel Dr. Roeland's deposition.  Plaintiffs argued they needed Dr. Roeland's deposition to respond to the Scripps Defendants' claims that they met the standard of care, did not cause Elizabeth's death, and did not violate the Probate Code.  Plaintiffs generally stated they had concerns regarding the foundation of Dr. Roeland's opinions and whether they were based in fact or science, but did not offer evidence to support these concerns.  Plaintiffs then asserted they needed to know whether Dr. Roeland was given access to Elizabeth's preliminary radiology report.  However, Plaintiffs did not explain how Dr. Roeland's access to the radiology report would have impacted the validity of his declaration.  In short, Plaintiffs did not present objective facts

26

raising a significant question regarding the validity of Dr. Roeland's declaration, which would impeach its foundational basis.

Plaintiffs also questioned Dr. Roeland's conclusion that the Scripps Defendants and Dr. Ritt complied with the Probate Code because that conclusion conflicted with deposition testimony from Drs. Ritt and Evans that they were informed of Elizabeth's advance health care directive but did not ask for a copy of it. Plaintiffs did not explain the foundational inadequacy with Dr. Roeland's conclusion, and there does not appear to be one. In his declaration, Dr. Roeland stated he had reviewed the depositions of Drs. Ritt and Evans. Dr. Roeland opined the standard of care did not require Dr. Ritt and the Scripps Defendants to ask for Elizabeth's advance health care directive because she had a POLST in her chart, which is often considered the same as an advance directive, and the POLST confirmed Christopher's representation of the contents of Elizabeth's advance directive. Plaintiffs appear to merely disagree with Dr. Roeland's conclusion that the Scripps Defendants and Dr. Ritt complied with the Probate Code. The disagreement does not impeach the foundational basis of Dr. Roeland's declaration.

Based on the foregoing, we conclude the trial court acted within its discretion in denying Plaintiffs' request to depose Dr. Roeland because Plaintiffs did not articulate a legitimate question regarding the foundation of Dr. Roeland's declaration based on objective facts.

27

## III. *Plaintiffs' Request for a Continuance*

Plaintiffs contend the trial court erred by denying their request to continue the hearing on the Scripps Defendants' and Dr. Ritt's summary judgment motions to allow Plaintiffs to supplement Dr. Boggeln's May 2016 declaration.

The summary judgment statute provides: "If it appears from the affidavits submitted in opposition to a motion for summary judgment . . . that facts essential to justify opposition may exist but cannot, for reasons stated, be presented, the court shall deny the motion, order a continuance to permit affidavits to be obtained or discovery to be had, or may make any other order as may be just. The application to continue the motion to obtain necessary discovery may also be made by ex parte motion at any time on or before the date the opposition response to the motion is due." (Code Civ. Proc., § 437c, subd. (h).) The party seeking a continuance must submit an affidavit or declaration showing " '(1) the facts to be obtained are essential to opposing the motion; (2) there is reason to believe such facts may exist; and (3) the reasons why additional time is needed to obtain these facts.' " (*Cooksey v. Alexakis* (2004) 123 Cal.App.4th 246, 254.)

Here, in their written opposition to the Scripps Defendants' and Dr. Ritt's summary judgment motions, Plaintiffs did not request a continuance, nor did they submit an affidavit making the necessary showing for a mandatory continuance. Rather, after the court expressed concerns about Dr. Boggeln's declaration at the summary judgment hearing, Plaintiffs informed the court, "[t]o the extent that the Court still has concerns regarding [Dr. Boggeln's] declaration, we're happy to submit an amended declaration to

28

address the Court's concerns." Plaintiffs' statement did not amount to a request for continuance and did not comply with the requirements of Code of Civil Procedure, section 437c, subdivision (h). Accordingly, the trial court did not abuse its discretion by not continuing the summary judgment hearing to provide Plaintiffs an opportunity to supplement Dr. Boggeln's declaration.

IV. *Trial Court's Evidentiary Rulings on Declarations Submitted in Support of and Opposition to Summary Judgment Motions*

Plaintiffs argue the trial court erred in overruling Plaintiffs' objections to defense expert declarations and sustaining Defendants' objections to Dr. Boggeln's opinions. The trial court's evidentiary determinations were critical to its summary judgment rulings in favor of Defendants on Plaintiffs' theories of negligence, wrongful death, and causes of action for statutory violations of the Probate Code. Thus, we consider Plaintiffs' arguments concerning the trial court's evidentiary rulings before addressing the trial court's orders granting summary judgment.

A. Legal Principles

"The declarations in support of a motion for summary judgment should be strictly construed, while the opposing declarations should be liberally construed. [Citation.] This does not mean that courts may relax the rules of evidence in determining the admissibility of an opposing declaration. Only *admissible evidence* is liberally construed in deciding whether there is a triable issue." (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 761 (*Bozzi*).) The trial court acts as a gatekeeper whose role is to

29

"exclude 'clearly invalid and unreliable' expert opinion." (*Sargon Enterprises, Inc. v. Univ. of Southern Cal.* (2012) 55 Cal.4th 747, 772 (*Sargon*).)

"[T]he gatekeeper's focus 'must be solely on principles and methodology, not on the conclusions that they generate.' " (*Sargon, supra*, 55 Cal.4th at p. 772.) "The value of opinion evidence rests not in the conclusion reached but in the factors considered and the reasoning employed." (*Pacific Gas & Electric, Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135.) An "expert opinion may not be based on assumptions of fact that are without evidentiary support or based on factors that are speculative or conjectural, for then the opinion has no evidentiary value and does not assist the trier of fact. [Citation.] Moreover, an expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based." (*Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510 (*Bushling*).)

Although in *Reid v. Google, Inc*. (2010) 50 Cal.4th 512, 535, the California Supreme Court expressly declined to reach the issue of the appropriate standard of review for reviewing a trial court's rulings on evidentiary objections made in connection with a summary judgment motion, the weight of authority, both before and after *Reid*, holds that an appellate court applies an abuse of discretion standard under these circumstances. (See, e.g., *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 852; *Ahn v. Kumho Tire U.S.A., Inc*. (2014) 223 Cal.App.4th 133, 143-144; *Kincaid v. Kincaid* (2011) 197 Cal.App.4th 75, 82-83; *Carnes v. Superior Court* (2005) 126 Cal.App.4th

688, 694.) De novo review is proper where evidentiary objections raise questions of law, such as whether or not a statement is hearsay. (*Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1451; see also *Sargon, supra,* 55 Cal.4th at p. 773.) In contrast, evidentiary objections based on lack of foundation, qualification of experts, and conclusory and speculative testimony are traditionally left to the sound discretion of the trial court. These are the types of evidentiary objections at issue in this case and, thus, we apply an abuse of discretion standard of review. "[T]he appropriate test of abuse of discretion is whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered." (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598.)

B. Plaintiffs' Expert Declarations

Plaintiffs offered multiple expert declarations from Dr. Boggeln to support their oppositions to Defendants' summary judgment motions. Plaintiffs argue the trial court abused its discretion in sustaining objections to Dr. Boggeln's opinions. As we shall explain, we conclude the trial court properly sustained most of Defendants' objections to Dr. Boggeln's opinions, but abused its discretion in sustaining some of the objections relevant to a cause of action premised on violations of the Probate Code.

In May 2016, Dr. Boggeln submitted a declaration in opposition to the Scripps Defendants' and Dr. Ritt's summary judgment motions. In that declaration, Dr. Boggeln set forth his background and stated he had "reviewed the pertinent medical records regarding Elizabeth . . . from Scripps . . . and Emeritus." Dr. Boggeln proceeded to set forth a lengthy medical chronology of events based on Elizabeth's medical records.

After detailing the medical chronology, Dr. Boggeln expressed his opinions regarding the care and treatment Elizabeth received from Defendants. Dr. Boggeln opined "to a reasonable degree of medical probability" that Defendants, or some of them, failed to comply with the standard of care and violated the Probate Code by: (1) failing to receive informed consent regarding changes in treatment, (2) failing to seek out and maintain Elizabeth's advance health care directive, (3) failing to note Elizabeth's capacity, (4) recommending Elizabeth not undergo advanced life support measures, (5) having inconsistencies between medical and billing records, (6) performing various tests on Elizabeth if they were not medically necessary, (7) performing a venipuncture on a patient with central venous and peripheral catheters, (8) preparing a draft POLST when the patient's wishes were recorded in writing, (9) failing to provide pain medication for 10 hours, and (10) refusing to provide life-sustaining treatment, including CPR, artificial nutrition, and hydration, requested by the patient and her family. Dr. Boggeln concluded Defendants' "standard of care and Probate Code violations were a substantial factor in injuring, and causing or contributing to [Elizabeth's] death."

The Scripps Defendants and Dr. Ritt objected to Dr. Boggeln's May 2016 declaration, arguing it lacked foundation, was conclusory, lacked in reason and fact, contained improper legal conclusions, and failed to address issues raised by their experts. The Scripps Defendants and Dr. Ritt also criticized Dr. Boggeln's declaration because he had not reviewed any transcripts from depositions completed in the case and did not acknowledge Elizabeth's dire condition and end-stage cancer.

The trial court sustained the Scripps Defendants' and Dr. Ritt's objections to Dr. Boggeln's declaration. The court found Dr. Boggeln provided little or no explanation for his conclusions, conducted only a limited review of "pertinent" medical records from Scripps and Emeritus, and omitted any mention of Elizabeth's end-stage terminal cancer.

On June 10, 2016, Plaintiffs submitted amended declarations from Dr. Boggeln in support of their oppositions to Dr. Lugo's, Dr. Mehta's, and Dr. Shieh's summary judgment motions. On June 17, 2017, Plaintiffs submitted a second amended declaration from Dr. Boggeln in opposition to Dr. Mehta's and Dr. Shieh's summary judgment motions. In his amended and second amended declarations, Dr. Boggeln expressed substantially the same opinions as in his original declaration. However, Dr. Boggeln acknowledged Elizabeth's cancer diagnosis and stated that cancer patients are not barred from receiving CPR. He opined that the life-sustaining treatment Elizabeth had requested in her advance health care directive would have sustained and improved her life. Dr. Boggeln also addressed defense expert opinions that Elizabeth could not tolerate artificial hydration beyond the amounts provided. He implied she could have received further hydration and Defendants' failures to provide her with fluids and tube feedings led to her death because they resulted in dehydration and malnutrition.

Drs. Lugo, Mehta, and Shieh objected to Dr. Boggeln's amended declarations, arguing they lacked foundation, were conclusory, contained improper legal conclusions, and overlooked key facts, such as Dr. Nasar's opinion that Elizabeth would die within a matter of days after her transfer to Scripps. The trial court sustained Dr. Lugo's, Dr. Mehta's, and Dr. Shieh's evidentiary objections, finding Dr. Boggeln had not reviewed

33

any deposition transcripts in the case and offered no analysis of how Elizabeth's advanced stage terminal cancer impacted his conclusory opinions that Drs. Lugo, Mehta, and Shieh had violated the standard of care and caused Elizabeth's death. The trial court also found Dr. Boggeln provided little explanation or reasoning for his conclusions.

1. *Opinions on Causation*

We begin our analysis with the fatal flaw in Dr. Boggeln's declarations, namely his failures to adequately address causation. Even applying a liberal construction to Dr. Boggeln's declarations, he did not attempt to explain how any of Defendants' alleged breaches of the standard of care and failures to comply with the Probate Code caused Elizabeth injury or death or how requested measures would have, in Dr. Boggeln's words, "improved the quality of her life." Not only did he fail to acknowledge Elizabeth's severely deteriorated condition when she was admitted to Scripps, he never explained how her compromised condition impacted his conclusions.

In his May declaration, without explanation or consideration of Elizabeth's dire medical condition, Dr. Boggeln stated the life-sustaining treatment Elizabeth and Christopher had requested, including CPR, artificial nutrition, and hydration, "would not have caused her harm, and in fact would have sustained her life and improved the quality of her life." He continued by opining "to a reasonable degree of medical probability" that Defendants' "standard of care and Probate Code violations were a substantial factor in injuring, and causing or contributing to [Elizabeth's] death." The trial court sustained Defendants' objections to these opinions on the basis that they were conclusory and lacked foundation. The trial court did not abuse its discretion in reaching this conclusion.

34

Of particular significance is the fact Dr. Boggeln never mentioned Elizabeth's advanced stage pancreatic cancer with metastases to her bones or explain how her severely compromised condition impacted his conclusion that Defendants' failures to comply with the standard of care and Probate Code substantially contributed to Elizabeth's death. Additionally, Dr. Boggeln did not address how Elizabeth's severely malnourished condition impacted her ability to receive artificial intravenous fluids or contradict defense expert evidence that intravenous fluids could have resulted in serious medical problems, including edema, reduced cardiac output, decreased lung function, discomfort, and hypotension. In short, he never explained how any of the requested treatments would have "improved her life." Nor did he acknowledge that physicians are not required to render medically ineffective health care, defined as treatment that would not offer any significant benefit. (Cal. Law Revision Com. com., 52B West's Ann. Prob. Code (2009 ed.) foll. § 4735, p. 453.)

Without at least some minimal basis, explanation, or reasoning, Dr. Boggeln's conclusions as to causation in his May declaration had no evidentiary value. (*Bushling, supra*, 117 Cal.App.4th at p. 509 [plaintiff "must show that defendants' breach of the standard of care was the cause, within a reasonable medical probability, of his injury"]; *Kelley v. Trunk* (1998) 66 Cal.App.4th 519, 525 [the summary judgment "standard is not satisfied by laconic expert declarations which provide only an ultimate opinion, unsupported by reasoned explanation"].)

In an attempt to remedy the deficiencies in Dr. Boggeln's May 2016 declaration, Plaintiffs submitted amended declarations in opposition to the summary judgment

35

motions by Drs. Lugo, Mehta, and Shieh. However, Dr. Boggeln's amended declarations suffered many of the same fatal deficiencies as his original declaration. In the amended declarations, Dr. Boggeln acknowledged Elizabeth's cancer diagnosis, but never recognized how compromised her condition was when she was admitted to Scripps. Instead, he stated he was "aware that some, but not all, resuscitative measures may cause a patient injury. While [Elizabeth] suffered from cancer, [his] experience [was] that cancer patients are not barred from receiving [CPR]." Dr. Boggeln's general statement that cancer patients can receive CPR did not address evidence regarding Elizabeth's specific cancer diagnosis including metastases to her ribs, and the likelihood that CPR would have crushed them, causing excruciating pain. An "expert may not base opinion upon a comparison if the matters compared are not reasonably comparable." (*Sargon, supra*, 55 Cal.4th at p. 770, citing *Roscoe Moss Co. v. Jenkins* (1942) 55 Cal.App.2d 369.) Here, Dr. Boggeln essentially compared Elizabeth to unspecified cancer patients without discussing facts pertinent to Elizabeth's specific case.

In his amended declarations, Dr. Boggeln also discussed defense expert opinions that Elizabeth could not tolerate artificial hydration beyond what was provided. Dr. Boggeln stated Elizabeth's medical records did not show she was harmed by tube feedings and intravenous fluids because her edema grades remained consistent from admission until her death. Dr. Boggeln implied Defendants' failures to provide Elizabeth with fluids and tube feedings led to her death because they resulted in dehydration and malnutrition. He stated, "[a]ny person, including with cancer, will die without proper fluids and nutrition." Again, Dr. Boggeln did not discuss the impact of facts pertinent to

36

Elizabeth, including her terminal medical condition, and critically omitted any discussion of the medical effectiveness of the care Elizabeth had requested in her advance health care directive. Notably, Dr. Boggeln did not address facts that Elizabeth entered Scripps in a severely malnourished and dehydrated condition and had significant wasting of her body that could not be treated or reversed. Without addressing this critical evidence, Dr. Boggeln did not sufficiently explain how Defendants' actions caused Elizabeth injury or death or how the treatment requested in her advance health care directive would have benefitted her or sustained or improved her condition.

Finally, we note that the trial court also criticized Dr. Boggeln's declaration because he relied on the determination of a licensed vocational nurse at Emeritus that Elizabeth's prognosis was greater than six months. Plaintiffs argued the trial court was required to accept the nurse's statement as true. However, a trial court can inquire into the type of material on which an expert relies. (*Sargon, supra*, 55 Cal.4th at p. 771.) " '[T]he expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors. . . ." ' " (*Id.* at p. 770.)

In this case, Dr. Boggeln relied on a form a licensed vocational nurse at Emeritus had completed in which she checked a box indicating Elizabeth did not have a condition or chronic disease that may result in life expectancy of less than six months. Although the prognosis notation required physician documentation and none was included with the form, Dr. Boggeln did not address or explain that deficiency. Instead, he appeared to take the nurse's prognosis determination as true without question or explanation. The trial court did not abuse its discretion in concluding Dr. Boggeln relied on an incomplete

37

form completed by a licensed vocational nurse and disregarded other relevant evidence from Dr. Nasar concerning Elizabeth's prognosis. Accordingly, Dr. Boggeln's opinion as to Elizabeth's prognosis lacked foundation in that it was based on incomplete facts.

As will be discussed, without expert testimony on causation, Plaintiffs could not defeat summary judgment on their professional negligence and wrongful death causes of action against Defendants.

2. *Opinions Regarding Standard of Care Violations*

In his declarations, Dr. Boggeln expressed numerous opinions regarding Defendants' alleged failures to comply with the standard of care. His opinions, however, were deficient because they did not account for each Defendant's differing role in Elizabeth's care. Instead, in discussing the alleged standard of care violations, Dr. Boggeln grouped the physician defendants and Scripps together. For example, he opined that "Scripps, Ritt, Lugo, Wiesner, Mehta, Evans, Shieh, King, Pund, and Ettari's failure to provide Dilaudid for nearly ten hours on February 20, 2013 failed to comply with the standard of care." Dr. Boggeln did not explain how each of these defendants was responsible for the failure of Elizabeth to receive pain medication during the relevant time period.

In fact, Dr. Boggeln acknowledged that some of the physicians he claimed violated the standard of care concerning pain medication did not see or treat Elizabeth on February 20, 2013. Specifically, Drs. Shieh and Wiesner had no involvement with Elizabeth's care on February 20, 2013, and members of the Appropriate Care Committee met at Elizabeth's bedside that day, but the meeting was before the relevant time period,

38

the committee recommended pain medications, and the committee did not make any orders prescribing pain medications. Dr. Boggeln does not state why or how Drs. Shieh and Wiesner and members of the Appropriate Care Committee were responsible for the administration of pain medication on February 20, 2013.

Concerning Drs. Lugo, Mehta, and Ritt, the doctors who had provided Elizabeth medical care on February 20, 2013, Dr. Boggeln admitted that these doctors had prescribed Elizabeth pain medications. Based on the undisputed facts set forth in Dr. Boggeln's declarations, on that day at 7:45 a.m., Dr. Lugo had prescribed 1.5 milligrams of hydromorphone every two hours as needed for pain. Thereafter, at 11:50 a.m., Dr. Ritt increased the hydromorphone to two milligrams every two hours as needed for pain. At 4:00 p.m., Dr. Mehta observed Elizabeth in pain. At 6:54 p.m., Dr. Mehta placed an order for Elizabeth to receive one milligram of hydromorphone every two hours as needed for pain.

Although Dr. Boggeln opined that Drs. Ritt, Lugo, and Mehta failed to comply with the standard of care because Elizabeth did not receive pain medication between 2:02 p.m. and 11:47 p.m. on February 20, 2013, his medical chronology reveals that these doctors (the only doctors who had provided Elizabeth medical care on that day) acted consistently with the Appropriate Care Committee's recommendations by placing orders

39

for pain medications. Dr. Boggeln did not set forth what actions, if any, the doctors were required to take beyond prescribing pain medications.[7]

Similarly, Dr. Boggeln opined that "Scripps, Ritt, Lugo, Wiesner, Mehta, Evans, Shieh, King, Pund, Ettari, and Knight's refusal to provide [CPR] when requested by the patient and her family violated the standard of care and Probate Code." Dr. Boggeln did not individually set forth how each of the defendants was responsible for providing Elizabeth CPR. For example, Dr. Boggeln did not state how Dr. Shieh, who was merely an oncology consultant and did not make any recommendations or orders regarding CPR, violated the standard of care by refusing to provide such treatment. Further, Dr. Boggeln did not explain how Scripps, a health care institution, was responsible for providing CPR. As we previously explained, he also failed to account for the various physicians' opinions that CPR would have crushed Elizabeth's bones and caused her excruciating pain.

Most, if not all, of Dr. Boggeln's opinions about alleged standard of care violations group Defendants together without explanation as to how each was responsible for the violation. His failure to indicate how each defendant's acts constituted a violation of the standard of care renders his opinions deficient.

---

[7] Plaintiffs did not allege who was responsible for the administration of pain medications, as prescribed by Elizabeth's physicians, nor did they sue any nurses who may have been involved in the administration of pain medications. Further, Plaintiffs did not contend in opposition to Defendants' summary judgment motions that Scripps or the physician defendants were liable for any nurse's administration of pain medications by virtue of an employment relationship.

3. *Opinions Regarding Probate Code Violations*

In addition to Dr. Boggeln's opinions concerning causation and alleged standard of care violations, he also expressed opinions relevant to Plaintiffs' causes of action for statutory violations of the Probate Code. Here, Plaintiffs alleged violations of section 4730 (communication of health care decisions); section 4731, subdivision (a) (requesting and maintaining advance directive); section 4732 (recording information about capacity); section 4736 (duties upon declining to comply with a health care instruction); and section 4742, subdivision (b) (concealment or inducement to change advance directive).

In general, the Health Care Decisions Law, as codified in the Probate Code, protects an individual's right to control decisions relating to his or her own health care, including end-of-life decisions, and provides the standards governing health care decisions. The Health Care Decisions Law also provides that where there are technical violations of these sections, health care providers and health care institutions are entitled to immunity when they "act[ed] in good faith and in accordance with generally accepted health care standards . . . ." (§ 4740.) Acting in accordance with generally accepted health care standards is equivalent to compliance with the standard of care. It is in this context we consider the trial court's rulings on Dr. Boggeln's opinions regarding these statutory violations.

a. Requesting and Maintaining Patient's Advance Directive

We start with Dr. Boggeln's opinion that the medical professional defendants violated the standard of care and Probate Code by failing to seek out and maintain Elizabeth's advance health care directive (§ 4731, subd. (a)). On this issue, the trial court

41

sustained Defendants' objections to Dr. Boggeln's opinions in his original and amended declarations that a POLST is different from an advance directive; and the standard of care and Probate Code require a physician who is aware of an advance directive to request a copy of it even if a POLST is already in the patient's file and family members have informed the physician of the patient's end-of-life wishes. This evidence contradicted defense expert opinions on these issues.

Because Dr. Boggeln's opinion was based on his experience, was not otherwise lacking in foundation, and was relevant to whether Defendants acted in accordance with generally accepted health care standards to qualify for immunity, we conclude the trial court erred in sustaining objections to Dr. Boggeln's opinion that a physician has a duty to request the patient's advance directive even if a POLST is in the medical record.

b. Communication, Capacity, Declining to Comply with Patient's Instructions, and Concealment or Inducement to Change Advance Directive

In his declarations in opposition to Defendants' summary judgment motions, Dr. Boggeln also offered opinions relating to Probate Code sections requiring communication of health care decisions, recordation of information about a patient's capacity, medical providers' duties upon declining to comply with a patient's health care instructions, and concealment or inducement to change a patient's advance directive. He stated the physician defendants failed to comply with the standard of care and Probate Code by failing to receive informed consent regarding changes in treatment; failing to note Elizabeth's capacity; failing to continue care; and preparing a draft POLST when the patient's wishes were recorded in writing.

42

Again, Dr. Boggeln did not account for the Defendants' individual roles and relationships to Elizabeth. He grouped members of the Appropriate Care Committee together with treating doctors, without regard to the differences in their responsibilities to the patient. For example, he did not explain how the Appropriate Care Committee members qualified as primary physicians who are required to document information about capacity. Similarly, he did not state which of the physician defendants, if any, made or were informed about a determination that Elizabeth lacked capacity, and he did not explain how any of the physicians individually failed to receive informed consent.[8]

Based on the foregoing, we conclude the trial court acted within its discretion in sustaining objections to Dr. Boggeln's opinions concerning Defendants' alleged breaches of the standard of care and violations of the Probate Code outlined above.

C. Defense Expert Declarations

Plaintiffs argue the trial court erred in overruling their objections to expert declarations offered by Drs. Lugo, Mehta, and Shieh. "Before an appellate court can knowledgeably rule upon an evidentiary issue presented, it must have an adequate record before it to determine if an error was made. For this purpose, we are limited to reviewing the matters appearing in the record." (*In re Mark C.* (1992) 7 Cal.App.4th 433, 445.) Although it was Plaintiffs' responsibility to include in the appellate record the portions of

---

[8]    For similar reasons, we conclude the trial court acted within its discretion in sustaining objections to Dr. Boggeln's opinions concerning whether Defendants fulfilled their duties upon declining to comply with Elizabeth's health care instructions and whether Defendants concealed or induced Elizabeth or Christopher to change Elizabeth's advance directive.

the reporter's transcript relevant to their issues on appeal (*Bianco v. California Highway Patrol* (1994) 24 Cal.App.4th 1113, 1125), Plaintiffs did not do so, nor did they provide a settled statement or agreed statement of the relevant hearings. Consequently, we address Plaintiffs' arguments to the extent we can from the record before us.

1. *Dr. Vincent Nguyen's Declaration in Support of Dr. Lugo's Summary Judgment Motion*

Dr. Lugo supported his summary judgment motion with an expert declaration from Dr. Nguyen. Plaintiffs argue the trial court erred by not sustaining their objections to Dr. Nguyen's declaration because as a doctor of osteopathic medicine (D.O.), rather than a doctor of medicine (M.D.), he was not qualified to render opinions in this case. They also argue Dr. Nguyen did not review Plaintiffs' deposition transcripts; his opinions contradicted the Probate Code; and he improperly opined, without analysis, that Dr. Lugo did not violate the Probate Code.[9] We reject Plaintiffs' arguments.

Dr. Nguyen was qualified to provide expert testimony in this case. "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) Contrary to Plaintiffs' argument, Dr. Nguyen's lack of an M.D. did not prevent him from being a qualified expert. "T]he Board of

---

[9] We need not consider Plaintiffs' arguments concerning Dr. Nguyen's opinions that Dr. Lugo complied with the Probate Code. As we explain later, based on section 4740, Dr. Lugo was immune from liability for alleged violations of sections 4730, 4732, 4736 and 4742, subdivision (b), and, on appeal, Plaintiffs have not argued the trial court erred in granting summary judgment in favor of Dr. Lugo on their section 4731, subdivision (a), 4732, and 4736 causes of action.

44

Osteopathic Examiners issues licenses which 'authorize the holders to practice medicine and surgery, the same as licensed physicians and surgeons.' " (*Hundley v. St. Francis Hospital* (1958) 161 Cal.App.2d 800, 803; see also Bus. & Prof. Code, § 2453, subd. (a).)

In any event, Dr. Nguyen had ample qualifications to testify as an expert. He was licensed to practice medicine in California and board certified in family practice and osteopathic manipulative treatment with "certificates of added qualification in [g]eriatric [m]edicine, and [h]ospice & [p]alliative [m]edicine." Further, Dr. Nguyen was the medical director of the palliative care program at a hospital, an assistant clinical professor in palliative medicine at a university medical center, chair of the Orange County POLST coalition, and a member of the POLST physician leadership council. Dr. Nguyen declared he was familiar with the standard of care in the community for physicians attending to geriatric patients in a hospital setting, including providing medical treatment and hospice care to terminally ill patients, obligations of physicians to provide only medically effective treatment, and the procedures that must be followed pursuant to the standard of care and Probate Code when there is a disagreement between physicians and the patient's or surrogate's wishes. With these qualifications, the trial court did not abuse its discretion in determining Dr. Nguyen was a qualified expert.

Plaintiffs next challenge Dr. Nguyen's declaration because he had not reviewed Plaintiffs' deposition transcripts. However, in objecting to Dr. Nguyen's declaration, Plaintiffs did not explain how their deposition testimony was relevant to or impacted Dr. Nguyen's opinions. As noted, because the record does not contain a reporter's transcript from the relevant hearing from which we can discern the basis of Plaintiffs' argument,

45

Plaintiffs have failed to provide a sufficient basis to establish the trial court abused its discretion.

2. *Dr. Rolf Ehlers's Declaration in Support of Dr. Mehta's Summary Judgment Motion*

Dr. Mehta supported her summary judgment motion with an expert declaration from Dr. Ehlers. Plaintiffs argue the trial court erred in overruling their objections to Dr. Ehlers's declaration because Dr. Ehlers did not state the type of medicine he practices, how long he has been a doctor, and his opinion on whether Dr. Mehta violated the Probate Code. We disagree.

Dr. Ehlers declared he was a physician licensed to practice in California, completed an internship and residency at the University of California, San Diego, was board certified in internal medicine, and practiced at a Sharp Community Medical Group. Further, Dr. Ehlers stated he was familiar with the standard of care for internal medicine physicians in the local community. Based on these qualifications, the trial court did not abuse its discretion in concluding Dr. Ehlers had sufficient qualifications to act as an expert in this case.

We also reject Plaintiffs' foundation challenge to Dr. Ehlers's declaration on the basis that he did not render an opinion as to whether Dr. Mehta violated the Probate Code. Although Dr. Ehlers did not directly reference the Probate Code, he addressed the substance of Plaintiffs' allegations that Dr. Mehta violated the Probate Code. For example, Dr. Ehlers opined that Dr. Mehta acted within the standard of care by: documenting her care and treatment of Elizabeth, communicating with Elizabeth's family,

46

not demanding Elizabeth's advance health care directive, and providing treatment and care to Elizabeth. Dr. Ehlers's failure to reference the Probate Code does not diminish his opinion that Dr. Mehta's actions, orders, recommendations, and communications were within the standard of care and directed at providing Elizabeth only medically beneficial and effective care without causing her further pain, suffering, or harm.

3. *Dr. Thompson Adams's Declaration in Support of Dr. Shieh's Summary Judgment Motion*

Dr. Shieh supported her summary judgment motion with an expert declaration from Dr. Adams. Plaintiffs argue the trial court erred in overruling their objections to Dr. Adams's declaration because Dr. Adams did not review the depositions of McDermet, Clenton, Knight, and Drs. Nasar, Wiesner, King, Mehta, Pund, and Ettari. Plaintiffs further argue Dr. Adams's declaration lacked foundation because he did not mention the Probate Code. We find these arguments unavailing.

As with their objections to Dr. Nguyen's declaration, Plaintiffs did not explain in the trial court or on appeal how the depositions they claim Dr. Adams should have reviewed impacted his opinions. Plaintiffs have not provided us with a sufficient basis to find the trial court abused its discretion.

Moreover, we reject Plaintiffs' challenge to Dr. Adams's declaration on the basis that he did not mention the Probate Code. Dr. Adams was not required to reference the Probate Code in providing opinions as to whether Dr. Shieh complied with the standard of care and caused Elizabeth to suffer harm or injury. For example, it was not necessary for Dr. Adams to reference the Probate Code when opining that Dr. Shieh complied with

47

the standard of care when she consulted with Elizabeth and recommended hospice care and palliative therapy, and communicated with Christopher. Likewise, it was not necessary for Dr. Adams to mention the Probate Code when opining Dr. Shieh's care and treatment was not a negligent cause of harm to Elizabeth.

## V. *Summary Judgments in Favor of Defendants*

Plaintiffs argue the trial court erred in granting summary judgment on their claims for professional negligence, wrongful death, negligent misrepresentation, and statutory Probate Code violations. We address each of Plaintiffs' arguments separately and reject them for reasons we detail below.

## A. <u>Summary Judgment Principles</u>

We review de novo the trial court's orders granting Defendants' motions for summary judgment. (*Yanowitz v. L'Oreal USA, Inc*. (2005) 36 Cal.4th 1028, 1037 (*Yanowitz*).) "A defendant's motion for summary judgment should be granted if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law. [Citation.] The burden of persuasion remains with the party moving for summary judgment." (*Kahn v. East Side Union High School Dist*. (2003) 31 Cal.4th 990, 1002-1003.)

"If the defendant 'carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact.' [Citation.] 'The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts

48

showing that a triable issue of material fact exists as to that cause of action . . . .' "
(*Schmidt v. Bank of America, N.A.* (2014) 223 Cal.App.4th 1489, 1497.)

"[T]o determine whether there is a triable issue, we review the evidence submitted in connection with summary judgment, with the exception of evidence to which objections have been appropriately sustained." (*Frittelli, Inc. v. 350 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, 41.) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Yanowitz, supra*, 36 Cal.4th at p. 1037.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

"Although our review of a summary judgment is de novo, it is limited to issues which have been adequately raised and supported in plaintiffs' brief." (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.) "[D]e novo review does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues." (*Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 116.) Further, "[p]oints raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument." (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453.) Accordingly, we limit our discussion to the specific points raised in Plaintiffs' opening brief.

49

B.  Plaintiffs' Professional Negligence and Wrongful Death Claims

Plaintiffs argue the trial court erred in granting summary judgment on their professional negligence and wrongful death claims.  Specifically, they contend: (1) Dr. Boggeln's declarations created a triable issue of fact concerning negligence; (2) the trial court erred in ruling the Appropriate Care Committee members did not owe Elizabeth a duty of care; (3) expert testimony was unnecessary to prove their claim for negligence based on lack of informed consent; and (4) a presumption of negligence arose from Defendants' violations of various statutes and regulations.  We reject Plaintiffs' arguments.

1. *Legal Principles of Professional Negligence and Wrongful Death*

" 'A cause of action for wrongful death is . . . a statutory claim.  (Code Civ. Proc., §§ 377.60–377.62.)  Its purpose is to compensate specified persons—heirs—for the loss of companionship and for other losses suffered as a result of a decedent's death.' [Citation.]  ' "The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the *pecuniary loss* suffered by the *heirs*." ' "  (*Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 968 (*Lattimore*).)  Here, Plaintiffs based their wrongful death action on theories of professional negligence and lack of informed consent by Knight and Drs. Lugo, Wiesner, Ritt, Mehta, Evans, Shieh, Boyd-King, Ettari, and Pund.

" 'The elements of a cause of action in tort for professional negligence are: (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate

50

causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence. [Citations.]' " (*Hahn v. Mirda* (2007) 147 Cal.App.4th 740, 746-747.) Further, "[i]t long has been held that an essential element of a cause of action for medical malpractice is a physician-patient relationship giving rise to a duty of care." (*Mero v. Sadoff* (1995) 31 Cal.App.4th 1466, 1471 (*Mero*).) " 'Informed consent is a subcategory of professional negligence doctrine.' " (*Townsend v. Turk* (1990) 218 Cal.App.3d 278, 284.)

2. *Dr. Boggeln's Declarations Did Not Raise a Triable Issue of Fact*

Plaintiffs argue Dr. Boggeln's declarations created a triable issue of fact on the elements of negligence because he concluded Defendants owed Elizabeth a duty of care, Defendants breached that duty, and there was a causal connection between the negligent conduct and the resulting injury. However, as previously explained, the trial court properly sustained Defendants' objections to Dr. Boggeln's opinions regarding causation. (See part IV.B.1, *ante*.) Without evidence contradicting Defendants' experts that Defendants did not cause Elizabeth injury or her death, Plaintiffs could not defeat summary judgment. (*Lattimore*, *supra*, 239 Cal.App.4th at p. 970 [" 'causation must be proven within a reasonable medical probability based upon competent expert testimony' "]; *Salasguevara v. Wyeth Laboratories, Inc.* (1990) 222 Cal.App.3d 379, 387 ["expert testimony is required to establish negligence in a medical malpractice case"].)

3. *Necessity of Expert Testimony to Establish Lack of Informed Consent*

As to Plaintiffs' wrongful death and professional negligence claims premised on a lack of informed consent theory, Plaintiffs argue that even if the trial court did not err in

51

sustaining objections to their experts' declarations, expert testimony was not required. Under the circumstances of this case, we disagree.

The doctrine of informed consent imposes upon a physician a "duty to disclose to a patient information material to the decision whether to undergo treatment." (*Arato v. Avedon* (1993) 5 Cal.4th 1172, 1175.) Expert testimony plays a limited role in determining the scope of a physician's duty to disclose information to a patient. (*Id*. at p. 1191.) In *Cobbs v. Grant* (1972) 8 Cal.3d 229 (*Cobbs*), our high court explained a physician's obligation to disclose risks inherent in a medical procedure is twofold: "[W]hen a given procedure inherently involves a known risk of death or serious bodily harm, a medical doctor has a duty to disclose to his patient the potential of death or serious harm, and to explain in lay terms the complications that might possibly occur." (*Id*. at p. 244.) "[A] doctor must also reveal to his patient such additional information as a skilled practitioner of good standing would provide under similar circumstances." (*Id*. at pp. 244-245.) Only the second category of information is a proper subject for expert testimony, as it may be needed to establish the standard in the industry. (*Daum v. SpineCare Medical Group, Inc*. (1997) 52 Cal.App.4th 1285, 1301-1302.)

Here, Plaintiffs do not contend that Defendants failed to disclose information regarding risks of death, serious harm, and complications that may result from treatment, and acknowledge they knew Elizabeth's death was imminent and her condition was terminal. Instead, Plaintiffs argue Defendants did not disclose they had changed Elizabeth's code status, withdrawn treatments, administered unnecessary treatments, and delayed transfer to another facility. These disclosures fall within the second category of

52

information in which expert testimony is needed to assess what, if any, disclosures would be made to the patient by a skilled practitioner in the relevant medical community under the circumstances.

Defendants presented expert opinion testimony that medical providers are not required to discuss every medical decision with the patient. They also presented expert opinion testimony that Defendants complied with the standard of care in their communications with Christopher concerning Elizabeth's treatment. In opposition, Plaintiffs presented Dr. Boggeln's declarations. In his May 2016 declaration offered in opposition to the Scripps Defendants' and Dr. Ritt's summary judgment motions, Dr. Boggeln generally stated the physician defendants' failures to receive informed consent for treatment violated the standard of care. This opinion was insufficient to defeat summary judgment as to the Scripps Defendants and Dr. Ritt because there was no explanation as to what disclosures the Scripps Defendants and Dr. Ritt were required to make to comply with the standard of care for informed consent, and Dr. Boggeln did not provide any reasoning as to how the Scripps Defendants' and Dr. Ritt's alleged failures to receive informed consent caused Elizabeth injury or her death. (See *Cobbs, supra*, 8 Cal.3d at p. 245.)

In regard to Drs. Lugo, Mehta, and Shieh, Dr. Boggeln's June 2016 declarations provided more detail for his opinion on the issue of informed consent. However, informed consent is a theory of negligence, which requires a showing of causation (*Cobbs, supra*, 8 Cal.3d at p. 245), and, as we previously discussed, Dr. Boggeln did not adequately address causation. His opinions on the matter were conclusory and did not

53

consider the impact of critical facts, including Elizabeth's severely compromised condition. (See part IV.B.1, *ante*.) Additionally, he did not set forth Drs. Lugo, Mehta, and Shieh's *individual* failures to receive informed consent.

Based on the foregoing, we conclude Plaintiffs could not defeat summary judgment on their negligence and wrongful death causes of action premised on lack of informed consent.

4. *The Appropriate Care Committee's Duty of Care*

Plaintiffs challenge the trial court's finding that Drs. Evans, Boyd-King, Ettari, and Pund (members of Scripps's Appropriate Care Committee) did not owe Elizabeth a duty of care.

" 'Whether a defendant owes a duty of care is a question of law.' " (*Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 588.) A physician's duty of care to a patient does not arise until a physician-patient relationship is established. (*Mero, supra*, 31 Cal.App.4th at p. 1471.) When a physician-patient relationship exists, "the patient has a right to expect the physician will care for and treat him with proper professional skills and will exercise reasonable and ordinary care and diligence toward the patient [citation]." (*Keene v. Wiggins* (1977) 69 Cal.App.3d 308, 313.)

Several courts have found a physician-patient relationship does not exist where the physician does not affirmatively treat or directly advise the patient. (*Rainer v. Grossman* (1973) 31 Cal.App.3d 539, 542-543 [holding a physician and professor of medicine did not have a physician-patient relationship under circumstances in which he recommended to a treating physician during a lecture that the treating physician's patient undergo

54

surgery]; *Clarke v. Hoek* (1985) 174 Cal.App.3d 208, 211 [holding a physician who acted as a proctor during surgery to evaluate surgeon's competence did not have a physician-patient relationship with patient undergoing surgery]; *Keene v. Wiggins, supra*, 69 Cal.App.3d at pp. 310-311 [holding no physician-patient relationship created where physician examined plaintiff for purpose of rating the plaintiff's injury for employer's insurance carrier in workers' compensation proceeding]; *Felton v. Schaeffer* (1991) 229 Cal.App.3d 229, 234 [holding no physician-patient relationship where defendants evaluated plaintiff solely for the purpose of a pre-employment physical examination].) Whether a duty of care is owed is decided on a case-by-case basis. (*Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1610.)

In this case, members of the Appropriate Care Committee evaluated Elizabeth's medical history, provided an opinion on what constituted medically ineffective care, and made recommendations when the treating physicians' plan of care was inconsistent with the patient's directives. Although these facts are not identical to those cases in which a physician conducted a pre-employment physical examination requested by the employer, rated an industrial injury for an insurance carrier, acted as a proctor to assess a colleague's competence, or opined on a case history in the context of an educational lecture, the cases make clear the critical inquiry is the nature of the relationship and contact between the physician and patient.

Under the circumstances of this case, we conclude Drs. Evans, Boyd-King, Ettari, and Pund did not have a physician-patient relationship with Elizabeth sufficient to impose upon them a duty of care. These doctors were members of the Appropriate Care

55

Committee, a team of volunteer physicians who provided recommendations when treating physicians' plan of care conflicted with the patient's wishes. Although the Appropriate Care Committee doctors met at Elizabeth's bedside, they did not treat Elizabeth. Rather, their role was limited to reviewing Elizabeth's medical records, considering the impressions of her consulting and treating physicians, and observing Elizabeth for the purpose of making recommendations that Elizabeth's treating physicians could accept or reject. The Appropriate Care Committee doctors' actions were insufficient to give rise to a physician-patient relationship and associated duty of care to Elizabeth.

Further, committees such as the Appropriate Care Committee serve a valuable role in patient care. They act as an independent review of what constitutes medically ineffective care and the patient's best interests when a treating physician declines to comply with a patient's health care instruction. The imposition of liability under these circumstances would be counterproductive to a valuable health care resource and would discourage physicians from participating in volunteer committees that serve an important and difficult role in circumstances in which medical providers believe complying with a patient's directives would be medically ineffective and cause the patient harm. For these reasons, public policy considerations militate against imposing a duty of care in this case.

5. *Negligence Per Se*

Plaintiffs next argue a presumption of negligence arose from Defendants' demands that Elizabeth's heirs abandon her advance directive, which they contend violated sections 4684 and 4714 requiring agents and surrogates to make decisions in accordance

56

with the patient's health care instructions. Plaintiffs also argue a presumption of negligence arose from Defendants' violations of provisions in state and federal regulations, including California Code of Regulations, title 22, section 70707, and 42 Code of Federal Regulations parts 489.102 and 482.13. Because their presumption of negligence theories were not identified in the fourth amended complaint and were not raised in their oppositions to Defendants' summary judgment motions, we reject Plaintiffs' arguments.

In their fourth amended complaint, Plaintiffs generally alleged Defendants were negligent because they "violated the Probate Code" and "violated the Code of Regulations." They did not allege a presumption of negligence arose from violations of the specific regulations they now rely upon and sections 4684 and 4714. Because Plaintiffs did not allege they were "entitled to rely on a presumption of negligence under a theory of negligence per se and did not ask permission to amend [their] complaint" to allege that theory, they are precluded from relying on negligence per se to defeat summary judgment. (*Millard v. Biosources, Inc*. (2007) 156 Cal.App.4th 1338, 1353.)

Further, in their oppositions to Defendants' summary judgment motions, Plaintiffs did not argue a presumption of negligence arose from sections 4684 and 4714 and the regulations upon which they now rely. Instead, in a single sentence, Plaintiffs stated a presumption of negligence arose from Defendants' violations of the Probate Code sections they asserted as separate causes of action (§§ 4730, 4731, 4732, 4736, and 4742). Plaintiffs mentioned 42 Code of Federal Regulations parts 489.102 and 482.13, but only in arguing Defendants intentionally violated the Probate Code. " 'A party is not

57

permitted to change his position and adopt a new and different theory on appeal.  To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' " (*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676.)  Accordingly, Plaintiffs cannot raise their presumption of negligence theory based on sections 4684 and 4714 and state and federal regulations for the first time on appeal.

C.  <u>Alleged Probate Code Violations</u>

Plaintiffs alleged Defendants violated multiple provisions of the Health Care Decisions Law, including sections 4730, 4731, subdivision (a), 4732, 4736, and 4742, subdivision (b).  A health care provider or health care institution that intentionally violates these sections is subject to liability to the aggrieved individual for damages plus attorney fees.  (§ 4742, subd. (a).)

"The main purpose of the Health Care Decisions Law is to provide 'procedures and standards' governing 'health care decisions to be made for adults at a time when they are incapable of making decisions on their own and [to] provide[] mechanisms for directing their health care in anticipation of a time when they may become incapacitated.' " (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 539.)  "In recognition of the dignity and privacy a person has a right to expect, the law recognizes that an adult has the fundamental right to control the decisions relating to his or her own health care, including the decision to have life-sustaining treatment withheld or withdrawn." (§ 4650, subd. (a).)  Thus, among its provisions, the Health Care Decisions Law allows a person to make

58

future health care decisions by executing an advance health care directive. (§§ 4605, 4670.)

However, there are exceptions to a patient's right to control his or her own health care. "A health care provider or health care institution may decline to comply with an individual health care instruction or health care decision that requires medically ineffective health care or health care contrary to generally accepted health care standards applicable to the health care provider or institution." (§ 4735.) " 'Medically ineffective health care,' . . . means treatment which would not offer the patient any significant benefit." (Cal. Law Revision Com. com., 52B West's Ann. Prob. Code (2009 ed.) foll. § 4735, p. 453.)

1. *Immunity Under Section 4740*

The trial court found Defendants were immune from liability under section 4740 for alleged violations of the Health Care Decisions Law because Defendants acted in good faith and in accordance with generally accepted health care standards. Plaintiffs contend the trial court erred in finding Defendants were immune from liability.

Under section 4740, "[a] health care provider or health care institution *acting in good faith and in accordance with generally accepted health care standards* applicable to the health care provider or institution is not subject to civil or criminal liability or to discipline for unprofessional conduct for any actions *in compliance with* [*the Health Care Decisions Law*], including, but not limited to, . . . : [¶] . . . [¶] (d) Declining to comply with an individual health care instruction or health care decision, in accordance with Sections 4734 to 4736, inclusive." (Italics added.)

59

Plaintiffs first argue that for Defendants to have immunity under section 4740, they had to satisfy three requirements: (1) Defendants must have acted in good faith, (2) in accordance with generally accepted health care standards, and (3) " 'in compliance' " with the Health Care Decisions Law. In other words, Plaintiffs read section 4740 to mean Defendants cannot have immunity if they violated the provisions of Health Care Decisions Law from which they seek immunity. However, statutory immunities apply where the entity or individual claiming immunity "would otherwise be liable under general principles of law." (*Caldwell v. Montoya* (1995) 10 Cal.4th 972, 985; *Nasrawi v. Buck Consultants LLC* (2014) 231 Cal.App.4th 328, 340 [" 'Conceptually, the question of the applicability of a statutory immunity does not even arise until it is determined that a defendant . . . would be liable in the absence of such immunity.' "].) Plaintiffs' interpretation of section 4740 would render the immunity meaningless because if a party claiming immunity had strictly complied with the Health Care Decisions Law, there would be no need for immunity. Immunities by their nature shield qualified parties from liability for legal violations. Accordingly, we conclude Defendants are immune from liability under section 4740 if they acted in good faith and in accordance with generally accepted health care standards.

Here, Defendants produced evidence that they acted in good faith, and Plaintiffs did not present contradictory evidence raising a triable issue of fact. In particular, Defendants' experts stated Defendants' "actions, orders, recommendations and communications were directed at providing only medically beneficial and medically effective care to the patient without causing her further pain, suffering or harm."

60

Although the experts did not use the term "good faith," their statements establish the substance of that requirement. Specifically, evidence that Defendants' actions were directed at providing only medically beneficial and effective care to Elizabeth without causing further pain, suffering, or harm is equivalent to a statement that they acted consistent with their moral and ethical obligations to do no harm to their patient.

Moreover, Defendants presented evidence that the Appropriate Care Committee informed Christopher that physicians could not provide Elizabeth with care they determined was futile because doing so would be outside the bounds of their ethical duties as physicians. Defendants' decisions to withhold the treatment requested in Elizabeth's advance health care directive was consistent not only with their ethical duties, but also with the Health Care Decisions Law. A physician may decline to comply with a patient's health care instruction that requires medically ineffective health care, which is treatment that would not offer the patient any significant benefit. (§ 4735; Cal. Law Revision Com. com., 52B West's Ann. Prob. Code (2009 ed.) foll. § 4735, p. 453.) Indeed, the California Legislature has recognized that "health care [that] does not improve the prognosis for recovery may violate patient dignity and cause unnecessary pain and suffering, while providing nothing medically necessary or beneficial to the person." (Prob. Code, § 4650, subd. (b).) Defendants' evidence that they undertook care of Elizabeth within the bounds of their ethical duties supports a finding that they acted in good faith.

Plaintiffs did not present evidence that Defendants had a lack of good faith or acted with a dishonest purpose. Thus, the uncontradicted evidence established Defendants acted in good faith.

Similarly, the defense expert declarations were sufficient to establish Defendants acted in accordance with generally accepted health care standards concerning communication of health care decisions (§ 4730), recording information about Elizabeth's capacity (§ 4732), fulfilling their duties upon declining to comply with Elizabeth's health care instructions (§ 4736), and suggesting Elizabeth's family members change her health care instructions, including by preparing a draft POLST (§ 4742, subd. (b)). Specifically, Defendants presented evidence through expert declarations that they acted reasonably, appropriately, and within the standard of care in performing these actions. Compliance with the standard of care means Defendants acted in accordance with generally accepted health care standards. (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 282 [standard of care is defined "as skill and knowledge 'ordinarily possessed and exercised' in a profession"], italics omitted.)

Plaintiffs did not present admissible evidence to the contrary because, as we previously explained, the trial court did not abuse its discretion in striking Dr. Boggeln's conclusory opinions that Defendants violated the standard of care with respect to communicating health care decisions, recording Elizabeth's capacity, recommending Elizabeth not undergo advanced life support measures, and preparing a draft POLST that changed Elizabeth's health care instructions. (See part IV.B.3.b, *ante*.)

Based on the foregoing, we conclude the trial court did not err in finding Defendants were immune from liability under section 4740 for alleged violations of sections 4730, 4732, 4736, and 4742, subdivision (b).

On Plaintiffs' remaining Probate Code claim, alleging Defendants violated section 4731, subdivision (a) by failing to request and maintain a copy of Elizabeth's advance health care directive in her medical record, the parties produced conflicting evidence on whether Defendants complied with the standard of care. Accordingly, the trial court erred in concluding Defendants were immune from violations of section 4731, subdivision (a). However, in their opening brief, Plaintiffs did not argue that the trial court erred in granting summary judgment on their section 4731, subdivision (a) claim against Drs. Lugo, Mehta, and Shieh. Thus, we need not consider section 4731, subdivision (a) as it relates to these physicians. (See part V.A, *ante*.) As we explain below, the trial court properly granted summary judgment in favor of the Scripps Defendants and Dr. Ritt on Plaintiffs' section 4731, subdivision (a) cause of action.

2. *Requesting and Maintaining Patient's Advance Directive (Section 4731)*

Plaintiffs argue the trial court erred in granting summary judgment on their section 4731, subdivision (a) claim against the Scripps Defendants and Dr. Ritt because these defendants knew of Elizabeth's advance health care directive, yet failed to request a copy and maintain it in her chart.

Section 4731, subdivision (a), provides: "A *supervising health care provider* who knows of the existence of an advance health care directive . . . shall promptly record its existence in the patient's health care record and, if it is in writing, shall request a copy. If

63

a copy is furnished, the supervising health care provider shall arrange for its maintenance in the patient's health care record."  (Italics added.)

Preliminarily, we must consider whether the Scripps Defendants and Dr. Ritt were supervising health care providers because section 4731 applies only to those providers. Supervising health care providers are either the patient's primary physician or the health care provider who has undertaken primary responsibility for the patient's health care. (§ 4641.)  A "[p]rimary physician" is "a physician designated by a patient or the patient's agent, conservator, or surrogate, to have primary responsibility for the patient's health care or, in the absence of a designation or if the designated physician is not reasonably available or declines to act as primary physician, a physician who undertakes the responsibility."  (§ 4631.)

Because there is no indication in the record that Elizabeth or Christopher, as her surrogate, designated a primary physician, we must consider whether Defendants undertook primary responsibility for Elizabeth's health care.

The Scripps Defendants include Scripps, Knight, and Drs. Evans, Boyd-King, Pund, and Ettari.  Plaintiffs argue Knight qualified as a supervising health care provider because she undertook primary responsibility for Elizabeth's discharge planning. However, it was undisputed that, in this case, the physicians made transfer decisions and recommendations, not Knight, who was merely acting to facilitate those decisions.  By assisting with Elizabeth's transfer to another facility, Knight did not undertake primary responsibility for Elizabeth's health care.  Thus, she was not a supervising health care provider for purposes of section 4731.

64

Plaintiffs do not explain how Scripps, a hospital, qualified as a supervising health care provider. The Health Care Decisions Law distinguishes between health care providers (§ 4621) and health care institutions (§ 4619). Health care providers are individuals providing health care, whereas health care institutions are institutions, facilities, or agencies authorized to provide health care. While Scripps may be a health care institution, it is not a health care provider within the meaning of the Health Care Decisions Law because it is not an "individual." (§ 4621.) Accordingly, it is also not a supervising health care provider. Plaintiffs have not provided authority to the contrary.

Plaintiffs contend Drs. Evans, Boyd-King, Pund and Ettari, as members of the Appropriate Care Committee, were supervising health care providers because they decided the care Elizabeth would receive while she was at Scripps. However, as we previously explained, the evidence established the Appropriate Care Committee members made recommendations to Elizabeth's treating physicians. The treating physicians could accept or reject the committee's recommendations as they saw fit. Plaintiffs did not present contradictory evidence. Further, the Appropriate Care Committee doctors did not have a physician-patient relationship with Elizabeth. (See part V.B.4, *ante*.) Under these circumstances, Drs. Evans, Boyd-King, Pund, and Ettari were not supervising health care providers because they did not assume primary responsibility for Elizabeth's health care.

Plaintiffs also suggest Dr. Evans was a supervising health care provider because he was chief of staff at Scripps and Drs. Ritt and Lugo sought his advice. Plaintiffs do not cite to any authority stating a hospital's chief of staff is a supervising health care provider solely by virtue of his or her role within the hospital. Further, Plaintiffs do not

65

cite to evidence establishing Dr. Evans undertook primary responsibility for Elizabeth's health care.

We assume Dr. Ritt was a supervising health care provider for purposes of section 4731. We nevertheless conclude the trial court properly granted summary judgment in Dr. Ritt's favor on Plaintiffs' section 4731, subdivision (a) cause of action.

Section 4731, subdivision (a) requires a supervising health care provider who knows of a patient's advance health care directive to record its existence in the patient's health care record, request a copy if it is in writing, and maintain a copy in the patient's health care record if it is furnished. For a supervising health care provider to be subject to liability for violating that section, the provider must have intentionally committed the violation. (§ 4742 [stating "[a] health care provider . . . that intentionally violates this part[, which includes section 4731,] is subject to liability to the aggrieved individual for damages of two thousand five hundred dollars ($2,500) or actual damages resulting from the violation, whichever is greater, plus reasonable attorney's fees"].)

Plaintiffs produced evidence Christopher informed Dr. Ritt of the contents of Elizabeth's advance health care directive, but Dr. Ritt did not request a copy. Elizabeth's health care record noted she had an advance directive. However, the record did not include a copy of it. Instead, Elizabeth's chart contained a POLST, which confirmed Christopher's representation of the contents of Elizabeth's advance directive.

According to Dr. Ritt's expert, Dr. Roeland, a POLST is often considered the same as an advance directive, the reference in Elizabeth's chart to an advance directive likely referred to a POLST, and Dr. Ritt was not required to request a copy of Elizabeth's

66

advance health care directive. Plaintiff's expert, Dr. Boggeln, contradicted Dr. Ritt's expert by opining a POLST is different than an advance directive, and a physician who is aware of an advance directive should request a copy of it even if the patient's file contains a POLST and the patient's family has confirmed the contents of the advance directive.

Despite the conflicting opinions as to whether Dr. Ritt should have requested a copy of Elizabeth's advance directive, the trial court did not err in granting summary judgment because there was no evidence that Dr. Ritt intentionally violated section 4731, subdivision (a), which was required to subject him to liability. (§ 4742.) The evidence established Dr. Ritt knew of the contents of Elizabeth's advance health care directive requiring advanced life support measures to prolong her life. He did not request a copy of the advance directive because he believed Christopher's representations regarding its contents. Dr. Ritt thought Elizabeth should not undergo advanced life support measures because those measures would cause her harm and were not in her best interests. Accordingly, Dr. Ritt spoke to Dr. Evans and initiated steps to involve the Appropriate Care Committee. This evidence is inconsistent with a finding that Dr. Ritt intentionally violated section 4731. Plaintiffs did not produce contradictory evidence concerning Dr. Ritt's intent.

Moreover, the purpose of the recording requirement in section 4731 is to "reduce[] the risk that a health-care provider or institution, or agent, [conservator] or surrogate, will rely on an outdated individual instruction or the decision of an individual whose authority has been revoked." (Cal. Law Revision Com. com., 52B West's Ann. Prob. Code (2009 ed.) foll. § 4731, p. 448.) There was no evidence that Dr. Ritt, or any other health care

67

provider, relied on an outdated instruction or the decision of an individual whose authority had been revoked. To the contrary, Elizabeth's health care providers were aware of Elizabeth's life support wishes and Christopher's ability to make decisions for her. No evidence established Dr. Ritt's failure to request a copy of Elizabeth's advance health care directive caused her injury or death.

Based on the foregoing, we conclude the trial court properly granted summary judgment in favor of the Scripps Defendants and Dr. Ritt on Plaintiffs' cause of action for violation of section 4731, subdivision (a).

D. Plaintiffs' Negligent Misrepresentation Claim

Plaintiffs argue the trial court erred in finding there was no triable issue of fact on their negligent misrepresentation claim against Scripps, Knight, and Drs. Evans, Ettari, Pund, Ritt, and Mehta. Specifically, Plaintiffs contend Drs. Evans, Ettari, Pund, Ritt, and Mehta misrepresented that Elizabeth would receive pain medication, nutrition, and fluids; a Scripps administrator and Dr. Ritt misrepresented that they would honor Elizabeth's advance health care directive and provide her treatment consistent with it; and Knight falsely represented Elizabeth would be immediately transferred to another facility. We address each alleged misrepresentation in turn.

"For a claim of negligent misrepresentation, '[a] plaintiff must prove the following in order to recover[:] "[M]isrepresentation of a past or existing material fact, without reasonable ground for believing it to be true, and with intent to induce another's reliance on the fact misrepresented; ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed; and resulting damage.

68

[Citation.]" [Citation.]' "  (*Goonewardene v. ADP, LLC* (2016) 5 Cal.App.5th 154, 175.)

"[A] positive assertion is required; an omission or an implied assertion or representation is not sufficient."  (*Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 243 (*Apollo*).)

    1.  *Representations Regarding Pain Medication, Nutrition, and Fluids*

Plaintiffs contend Drs. Evans, Ettari, Pund, Ritt, and Mehta misrepresented Elizabeth would receive pain medication and life-sustaining nutrition and fluids.  As we shall explain, the evidence on which Plaintiffs rely does not support their negligent misrepresentation claim against these defendants.

Plaintiffs first cite to Christopher's testimony that the Appropriate Care Committee assured him Elizabeth would continue to receive pain medication, fluids, and nutrition. The Appropriate Care Committee documented its recommendations, including that appropriate care for Elizabeth included treatment to preserve her comfort, such as oxygen, intravenous fluids, and pain medications.  Further, the Appropriate Care Committee documented that it did not object to continuing artificial nutrition.  Plaintiffs have not pointed to any evidence that members of the Appropriate Care Committee did not have reasonable grounds to believe its representations were true or that treating physicians would not follow its recommendations.

Further, Plaintiffs have not shown they justifiably relied on the Appropriate Care Committee's representations in making decisions regarding Elizabeth's care or transfer. In their fourth amended complaint, Plaintiffs alleged that in reliance on Defendants' representations, Elizabeth remained at Scripps.  However, Plaintiffs do not dispute that

69

when the Appropriate Care Committee informed Christopher of their recommendations, he reiterated that he wanted Elizabeth transferred. Accordingly, Plaintiffs failed to show a triable issue of fact on justifiable reliance as to members of the Appropriate Care Committee.

Plaintiffs next cite to Christopher's testimony that he "*may* have talked Dr. Mehta about [Elizabeth's] pain medication," but he did not recall what Dr. Mehta said to him. This evidence is insufficient to create a triable issue of fact on Plaintiffs' negligent misrepresentation claim because such claim requires a positive assertion of a misrepresentation. (*Apollo, supra*, 158 Cal.App.4th at p. 243.)

We discuss Dr. Ritt's alleged misrepresentations about providing Elizabeth with pain medications, nutrition, and fluids below.

2. *Representations Regarding Compliance with Elizabeth's Advance Directive*

Plaintiffs argue a Scripps administrator and Dr. Ritt misrepresented they would honor Elizabeth's advance health care directive and provide her treatment consistent with it. We reject Plaintiffs' argument because it is not supported by the evidence they cite.

Plaintiffs first point to Christopher's testimony that a Scripps administrator stated to him that she would have a discussion with Dr. Evans about continuing Elizabeth's treatment consistent with Elizabeth's advance health care directive. Christopher understood the administrator's representation to mean that the Appropriate Care Committee's recommendation would be changed.

70

The Scripps administrator's statement to Christopher that she would have a discussion with Dr. Evans does not constitute a positive assertion that Elizabeth's physicians would comply with her advance health care directive or that the Appropriate Care Committee would change its recommendations. "Parties cannot read something into a neutral statement in order to justify a claim for negligent misrepresentation." (*Diediker v. Peelle Financial Corp.* (1997) 60 Cal.App.4th 288, 297.)

Plaintiffs next assert Dr. Ritt represented Elizabeth's advance health care directive would be honored. To support this claim, Plaintiffs cite to Christopher's testimony that Dr. Ritt "expressed concerns regarding honoring the advanced directive, but he did not say that the advanced directive would not be honored." This testimony does not support a claim for negligent misrepresentation because it does not amount to a positive assertion that Dr. Ritt would follow Elizabeth's advance health care directive.

Plaintiffs also cite to testimony that Christopher understood from a conversation with Dr. Ritt that Elizabeth would continue to receive artificial nutrition, hydration, and pain medications consistent with her advance health care directive. Plaintiffs do not point to a positive assertion by Dr. Ritt. Further, Plaintiffs do not dispute that Dr. Ritt placed orders for Elizabeth to receive tube feedings and intravenous pain medications. These orders were consistent with Elizabeth's advance health care directive and her family's wishes. Accordingly, even if Dr. Ritt represented Elizabeth would receive pain medication, nutrition, and hydration consistent with her advance health care directive, he acted in accordance with that representation, belying Plaintiffs' misrepresentation claim.

71

3. *Representations Regarding Elizabeth's Transfer to Another Facility*

Plaintiffs contend Knight negligently misrepresented on February 20, 2013, that Elizabeth would be immediately transferred to Emeritus or another facility. The evidence Plaintiffs cite does not support a claim for negligent misrepresentation. First, Plaintiffs point to Knight's case management notes stating she had a conversation with Christopher, who expressed his desire to have Elizabeth moved to another facility. The notes reveal Knight "offered to facilitate as able" and recommended Christopher contact Elizabeth's insurance for assistance in identifying a facility that would accept Elizabeth's care. This evidence does not reveal an affirmative misrepresentation that Elizabeth would be immediately transferred.

Second, Plaintiffs point to Christopher's testimony that he may have had a conversation with Knight on February 19, 2013. The testimony Plaintiffs cite does not reveal any details about Knight's conversation with Christopher. Accordingly, it does not support a claim for negligent misrepresentation.

## VI. *Motion for Reconsideration*

Plaintiffs argue the trial court erred in denying their motion to reconsider the summary judgment rulings in favor of the Scripps Defendants and Dr. Ritt.[10] We disagree.

---

10    Plaintiffs moved for reconsideration of the order granting summary judgment in favor of the Scripps Defendants and Dr. Ritt. The trial court entered judgment in favor of the Scripps Defendants and Dr. Ritt before ruling on Plaintiffs' motion for reconsideration. "[T]he entry of judgment had the effect of denying [Plaintiffs'] motion

Code of Civil Procedure section 1008 allows any party affected by a court's order to request that court reconsider the matter "based upon new or different facts, circumstances, or law." A party seeking reconsideration of a court's order under Code of Civil Procedure section 1008 must not only show new or different facts, circumstances or law, but also must give a satisfactory explanation for not producing such facts or information at the original hearing. (*The New York Times Co. v. Superior Court* (2005) 135 Cal.App.4th 206, 212-213 (*New York Times*); *Garcia v. Hejmadi* (1997) 58 Cal.App.4th 674, 690.) Where evidence addressed in the motion for reconsideration is available to a party before the initial motion is heard, such evidence is not considered "new" for purposes of a motion for reconsideration. (*Lucas v. Santa Maria Public Airport Dist*. (1995) 39 Cal.App.4th 1017, 1028; *Garcia,* at pp. 689-690.) We review the court's ruling on a motion for reconsideration under the abuse of discretion standard. (*New York Times,* at p. 212; *Glade v. Glade* (1995) 38 Cal.App.4th 1441, 1457.)

Plaintiffs argue they presented new and different facts warranting reconsideration that were not available at the time they filed their opposition to the Scripps Defendants' and Dr. Ritt's summary judgment motions. As "new or different facts," Plaintiffs pointed to deposition testimony from witnesses deposed after Plaintiffs filed their oppositions or whose deposition transcripts were not available at that time. Plaintiffs contended deposition transcripts were not available for three defense witnesses: Tamara Winkler, Pamela Letzkus, and Jill Platt.

---

[for reconsideration] by implication." (*Ramon v. Aerospace Corp.* (1996) 50 Cal.App.4th 1233, 1238.)

Plaintiffs had completed or were in the process of scheduling the depositions of Winkler, Letzkus, and Platt before filing their oppositions to the Scripps Defendants' and Dr. Ritt's summary judgment motions. Plaintiffs did not request to continue the summary judgment hearings on the basis of the pending deposition transcripts. (*New York Times, supra*, 135 Cal.App.4th at p. 215 [holding that evidence was not new or different within the meaning of Code Civ. Proc., § 1008 where it was revealed in depositions held two business days before the hearing, and noting that the moving party could have moved for a continuance to present the deposition transcripts to the court if they were not ready at the time of the hearing].) Moreover, Plaintiffs did not explain how facts obtained from Winkler, Letzkus, and Platt's depositions constituted new evidence impacting the analysis of the Scripps Defendants' and Dr. Ritt's summary judgment motions or how the facts were materially different from those already presented.

As "new or different facts," Plaintiffs also argued they had obtained a supplemental declaration from Dr. Boggeln. Plaintiffs did not explain why they could not have obtained a supplemental declaration from their own expert before they filed their opposition to the Scripps Defendants' and Dr. Ritt's summary judgment motions. Further, Plaintiffs did not set forth what information in Dr. Boggeln's supplemental declaration constituted new or different facts warranting reconsideration of the Scripps Defendants' and Dr. Ritt's summary judgment motions.

Based on the foregoing, we conclude the trial court did not abuse its discretion by implicitly denying Plaintiffs' motion for reconsideration.

74

VII. *Costs and Expert Fees Awards*

A. <u>Trial Court's Costs Awards</u>

Plaintiffs argue the trial court abused its discretion by awarding Defendants impermissible costs. As we shall explain, we reject Plaintiffs' arguments.[11]

"Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (Code Civ. Proc., § 1032, subd. (b).) Code of Civil Procedure section 1033.5 sets forth the items of costs that may or may not be recoverable in a civil action. "An item not specifically allowable under subdivision (a) nor prohibited under subdivision (b) may nevertheless be recoverable in the discretion of the court if 'reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation.' " (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774 (*Ladas*).)

"If the items appearing in a cost bill appear to be proper charges, the burden is on the party seeking to tax costs to show that they were not reasonable or necessary. On the other hand, if the items are properly objected to, they are put in issue and the burden of proof is on the party claiming them as costs. [Citations.] Whether a cost item was

_____

11    Drs. Ritt, Lugo, Mehta, and Shieh argue this Court does not have jurisdiction to review the trial court's orders awarding costs because Plaintiffs did not separately appeal those orders. However, Plaintiffs appealed judgments that awarded Defendants unspecified costs and provided for a later determination of the amount. "[W]hen a judgment awards costs and fees to a prevailing party and provides for the later determination of the amounts, the notice of appeal subsumes any later order setting the amounts of the award." (*Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993, 998.) Accordingly, this Court has jurisdiction to consider the trial court's costs awards.

reasonably necessary to the litigation presents a question of fact for the trial court and its decision is reviewed for abuse of discretion." (*Ladas, supra*, 19 Cal.App.4th at p. 774.)

Based on these principles, we address the various cost items challenged by Plaintiffs.

1.  *Dr. Lugo's Documentation Regarding Costs*

Plaintiffs contend Dr. Lugo failed to serve them with documents supporting his opposition to their motion to tax costs. The record contains a proof of service, dated December 29, 2016, for Dr. Lugo's notice of lodgment in support of his opposition to Plaintiffs' motion to strike or tax costs. The proof of service states Dr. Lugo served Plaintiffs by both mail and facsimile transmission. Counsel for the Estate, Clenton, and McDermet submitted a declaration in which he stated he had not received Dr. Lugo's notice of lodgment by January 6, 2017.

"The filing of a proof of service creates a rebuttable presumption that the service was proper." (*Floveyor Internat., Ltd. v. Superior Court* (1997) 59 Cal.App.4th 789, 795.) "Whether that presumption has been rebutted is a question of fact to be resolved in the trial court." (*Glasser v. Glasser* (1998) 64 Cal.App.4th 1004, 1010-1011 (*Glasser*).)

Here, the trial court's order granting in part and denying in part Plaintiffs' motion to tax costs did not make a specific finding on the issue of whether Plaintiffs had been properly served with Dr. Lugo's notice of lodgment. The hearing on the motion was not reported. We presume the trial court found service was proper. (*Estate of Fain* (1999) 75 Cal.App.4th 973, 992.) Based on the proof of service in the record, substantial evidence

76

supports a finding that service was proper. (See *Glasser, supra*, 64 Cal.App.4th at pp. 1010-1011.)

We also reject Plaintiffs' argument that Dr. Lugo did not timely file his notice of lodgment in support of his opposition to Plaintiffs' motion to tax costs. Plaintiffs cite no authority for their argument. Further, Plaintiffs do not explain how they were prejudiced by Dr. Lugo's late filing of his notice of lodgment and nothing in the record suggests Plaintiffs requested a continuance based on their claim that they did not receive Dr. Lugo's documents. No prejudice appears on the face of the record.

2. *Reasonableness of Deposition Fees*

Plaintiffs contend the trial court erred by making no inquiry into the reasonableness of Defendants' deposition costs. Plaintiffs cite to a declaration from counsel for the Estate, McDermet, and Clenton, stating it is typical practice in the community for multiple parties on the same side of a case to share a single copy of a deposition transcript to reduce costs, and reporters frequently agree to discount their published copy rates when parties order multiple copies of the same transcript. The hearings on Plaintiffs' motions to tax costs were not reported and the trial court's order did not make specific findings regarding the reasonableness of Defendants' alleged failure to share deposition transcripts. We presume the trial court considered the reasonableness of the costs Defendants incurred for deposition transcripts and found the costs reasonable in awarding them. (*Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 187.) Further, although it may be common practice for parties on the same side of a

77

case to share transcripts, there is no suggestion in the record that it was unreasonable for Defendants to order separate copies.

Plaintiffs also challenge the trial court's award to Dr. Mehta and the Scripps Defendants of "technology fees" to take the depositions of McDermet and Christopher. To support their argument, Plaintiffs cite to various invoices in the record. Plaintiffs did not cite to the portion of their motions to tax the Scripps Defendants and Dr. Mehta's costs wherein Plaintiffs challenged technology fees. Based on our review of Plaintiffs' motions, they did not object to any claimed technology fees incurred by Dr. Mehta and the Scripps Defendants.[12]

Plaintiffs also argue that for "deposition transcripts ordered by the Scripps Defendants, Ritt, Mehta, and Shieh, the trial court failed to distinguish what was included in the final total amount (i.e., taxes, finance charges, and price per page)." Plaintiffs cite no authority, and we have found none, for the proposition that the trial court was required to provide a breakdown of its award for deposition transcripts. Accordingly, we find no merit to Plaintiffs' argument.

Lastly, Plaintiffs argue they are unable to address whether Dr. Lugo's claimed deposition costs are consistent with the trial court's ruling because they never received

---

[12] A motion to tax costs must specify the item objected to and state why the item is objectionable. (Cal. Rules of Court, rule 3.1700(b)(2).) "As a general rule, 'The reviewing court is not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment.' [Citations.] It is the duty of counsel to refer the reviewing court to the portion of the record which supports appellant's contentions on appeal. [Citation.] If no citation 'is furnished on a particular point, the court may treat it as waived.' " (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115; *Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768.)

documents supporting Dr. Lugo's opposition to Plaintiffs' motion to tax costs. As we previously explained, there was substantial evidence in the record supporting Dr. Lugo's service of his notice of lodgment in support of his opposition to Plaintiffs' motion to tax costs.

### 3. *Subpoenas*

Plaintiffs argue the trial court erred by failing to tax the Scripps Defendants an additional $402 and Dr. Ritt an additional $387 for costs associated with multiple subpoenas that resulted in no records. Plaintiffs cite to more than 60 pages of subpoena invoices in the record without providing an explanation as to how they calculated the amounts they contend should have been taxed. Further, Plaintiffs cite to no authority for their argument. We will not develop Plaintiffs' argument for them or engage in an unguided calculation to determine how Plaintiffs arrived at the amounts of $402 for the Scripps Defendants and $387 for Dr. Ritt. (See *Falcone & Fyke, supra,* 164 Cal.App.4th at p. 830.)

### 4. *Jury Fees*

Plaintiffs argue the trial court erred by ordering them to pay for multiple payments of jury fees for Defendants' side of the case.

Code of Civil Procedure section 631, subdivision (b) provides: "At least one party demanding a jury on each side of a civil case shall pay a nonrefundable fee of one hundred fifty dollars ($150), unless the fee has been paid by another party on the same side of the case. The fee shall offset the costs to the state of providing juries in civil cases. If there are more than two parties to the case, for purposes of this section only, all

plaintiffs shall be considered one side of the case, and all other parties shall be considered the other side of the case." The fees are nonrefundable. (Code Civ. Proc., § 631.3, subd. (c).) However, jury fees are recoverable as costs to the prevailing party. (Code Civ. Proc., § 1033.5, subd. (a)(1).)

Plaintiffs did not dispute Defendants were entitled to recover jury fees under Code of Civil Procedure section 1033.5, subdivision (a)(1). Instead, they argued they should not be responsible for multiple jury deposits because Code of Civil Procedure section 631, subdivision (b) required only one defendant to make a jury deposit. Although Code of Civil Procedures section 631, subdivision (b) provides that "[a]t least one party demanding a jury on each side of a civil case" shall pay a nonrefundable jury deposit, the statute does not prevent multiple parties on one side of a case from paying jury deposits. Defendants produced evidence they made separate $150 jury fee deposits and that it is customary and reasonable for each defendant to make a separate deposit of advanced jury fees to prevent an inadvertent waiver of the right to a jury. Plaintiffs did not produce contrary evidence. Accordingly, the trial court did not abuse its discretion by awarding Defendants their jury fees.

5. *Reasonableness of Expert Fees*

Plaintiffs argue the trial court erred by not requiring Defendants to show their expert fees were reasonable. Plaintiffs' contention is based on a comparison of the hours Defendants' experts incurred in this case compared to experts in other cases. Plaintiffs rely on *Evers v. Cornelson* (1984) 163 Cal.App.3d 310 and *Chaaban v. Wet Seal, Inc.* (2012) 203 Cal.App.4th 49. In *Evers*, plaintiff sued for damages arising out of an

80

automobile accident and her expert spent eight and a half hours on trial preparation, which the court found was reasonable. (*Evers*, at pp. 314, 317.) In *Chaaban*, the plaintiff sued her employer for wrongful termination in violation of public policy. (*Chaaban*, at p. 51.) The employer's expert spent seven hours reviewing depositions and records, which the court determined was reasonable. (*Id*. at p. 56, fn. 6.)

A comparison of *Evers* and *Chaaban* to the case before us does not show Defendants' expert fees were unreasonable. As the trial court noted, Plaintiffs sued Scripps, numerous physicians, and a nurse, alleging medical malpractice and several Probate Code violations. The complexities of each case are different and no precise formula can be drawn from prior cases to determine the reasonableness of expert hours. Accordingly, we reject Plaintiffs' argument that Defendants' expert fees were unreasonable merely because the experts spent more time on the case than experts in other cases.

Further, Plaintiffs did not argue in their motions to tax costs that the hours Defendants' experts incurred were unreasonable because they were excessive when compared to other cases. It is well settled that a point not raised in the trial court is barred on appeal. (See *Amato v. Mercury Casualty Co*. (1993) 18 Cal.App.4th 1784, 1794; *City of San Diego v. D.R. Horton San Diego Holding Co., Inc*. (2005) 126 Cal.App.4th 668, 685.)

B.  Trial Court's Expert Fees Award

Plaintiffs argue the trial court abused its discretion in awarding Defendants expert fees under Code of Civil Procedure section 998 and refusing to scale down fees based on the parties' financial positions.

Under Code of Civil Procedure section 998 "any party may serve an offer in writing upon any other party to the action to allow judgment to be taken or an award to be entered in accordance with the terms and conditions stated at that time. . . . [¶] . . . [¶]  If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall . . . pay the defendant's costs from the time of the offer.  In addition, . . . the court . . . , in its discretion, may require the plaintiff to pay a reasonable sum to cover postoffer costs of the services of expert witnesses . . . ." (Code Civ. Proc., § 998, subds. (b) & (c)(1).)  The purpose of the statute "is to encourage the settlement of litigation without trial."  (*Jones v. Dumrichob* (1998) 63 Cal.App.4th 1258, 1262 (*Jones*).)

Between September and March 2015, Defendants served Plaintiffs offers to compromise for a dismissal in exchange for a waiver of costs.  Based on the record before us, Dr. Ritt served his offers to compromise on only the Estate and Clenton. Plaintiffs did not accept the offers.  Thus, in awarding Defendants their costs, the trial court awarded Defendants expert fees under Code of Civil Procedure section 998.  In doing so, the court found Defendants made good faith and reasonable offers to compromise to Plaintiffs.

82

Plaintiffs raise several arguments challenging the validity of the Code of Civil Procedure section 998 offers and the trial court's awards of expert fees. We address each of Plaintiffs' arguments below.

1. *Reliance on Statements Made During Mediation*

Plaintiffs argue that in awarding Defendants expert fees, the trial court erred by relying on confidential statements made during mediation. Plaintiffs do not describe the relevant statements, but cite to various pages in the record. Based on our review of record pages cited, we set forth our understanding of Plaintiffs' argument.

In opposition to Plaintiffs' motions to tax costs, the Scripps Defendants and Drs. Ritt and Lugo submitted declarations from counsel stating that during a mediation in August 2014, Defendants conveyed they had evaluated the case to be one of very unlikely liability for virtually the same reasons set forth in their summary judgment motions and because nothing Defendants were alleged to have done or failed to do would have resulted in a different outcome for Elizabeth, given her terminal status. The trial court's orders on Plaintiffs' motions to tax costs stated, "[Defendants'] offers for a waiver of cost were made very early on in the litigation. Defendants maintained that [P]laintiffs could not show causation because their mother was terminally ill when she was placed in their care. The court eventually agreed that [P]laintiffs had not shown causation and summary judgment was granted in favor of [all] defendants."

In general, statements made during a mediation are confidential. (Evid. Code, § 1119.) Here, although the trial court's order stated "Defendants had maintained that [P]laintiffs could not show causation because their mother was terminally ill," there is no

83

basis to conclude the trial court relied on statements protected by the mediation confidentiality. Elizabeth's terminal illness and the fact that Defendants offered to waive costs early in the litigation were not disputed or confidential matters. Based on the record, it is clear the parties disputed causation throughout the litigation. Further, even if the trial court referenced a confidential statement, the trial court's expert fees award was not based on that statement alone. Rather, the trial court based its expert fees award on numerous factors, including the complexity of the case, the number of parties, that Plaintiffs should have expected a vigorous defense by experienced lawyers, that offers to waive costs were made very early on in the litigation, and this was a highly contested case. We find no basis to reverse the expert fee awards based on the trial court's alleged reliance on statements protected by the mediation confidentiality.

2. *Good Faith and Reasonableness*

Plaintiffs argue Defendants' offers to compromise under Code of Civil Procedure section 998 were invalid because they were not made in good faith and were unreasonable. We are not persuaded by Plaintiffs' arguments.

"To effectuate the purpose of the statute, a [Code of Civil Procedure] section 998 offer must be made in good faith to be valid. [Citation.] Good faith requires that the pretrial offer of settlement be 'realistically reasonable under the circumstances of the particular case. Normally, therefore, a token or nominal offer will not satisfy this good faith requirement, . . . ' [Citation.] . . . One having no expectation that his or her offer will be accepted will not be allowed to benefit from a no-risk offer made for the sole purpose of later recovering large expert witness fees." (*Jones, supra*, 63 Cal.App.4th at

84

pp. 1262-1263.) However, "even a 'modest settlement offer' may be in good faith if it is believed the defendant has a significant likelihood of prevailing at trial." (*Id.* at p. 1264 [finding offer of waiver of costs was made in good faith where the "offer carried a significant value to appellants because, if accepted, it would have eliminated appellants' exposure to the very costs" subject to the appeal].) "We review the trial court's award of expert witness fees as a [Code of Civil Procedure] section 998 discretionary item of costs using an abuse of discretion standard." (*Id*. at p. 1262.)

Here, the trial court found "[D]efendants' offers carried a significant value to [P]laintiffs because, if accepted, it would have eliminated their exposure to the very costs which are the subject of [Plaintiffs'] motions [to tax costs], a sum they can hardly claim now to be de minimis." Plaintiffs contend the trial court erred by evaluating the value of Defendants' offers using anticipated costs rather than the value at the time of the offer. Essentially, Plaintiffs suggest that for the offers to have had value, Defendants must have already incurred significant costs. Nothing in Code of Civil Procedure section 998 requires that a defendant must have incurred substantial costs for his or her offer to waive costs to have value. Rather, "[w]hen a defendant perceives himself to be fault free and has concluded that he has a very significant likelihood of prevailing at trial, it is consistent with the legislative purpose of [Code of Civil Procedure] section 998 for the defendant to make a modest settlement offer. If the offer is refused, it is also consistent with the legislative intent for the defendant to engage the services of experts to assist him in establishing that he is not liable to the plaintiff. It is also consistent with the legislative purpose under such circumstances to require the plaintiff to reimburse the defendant for

85

the costs thus incurred." (*Culbertson v. R. D. Werner Co., Inc*. (1987) 190 Cal.App.3d 704, 710-711.)

Plaintiffs' argument ignores that Defendants' offers did have significant value at the time they were made. As the trial court noted, Plaintiffs sued a hospital, nine physicians, and a nurse, alleging numerous causes of action, including various Probate Code violations and medical malpractice based on several alleged breaches of the standard of care. Based on the complexity of Plaintiffs' claims and the need for expert testimony in medical malpractice cases such as this one (*Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 305), Plaintiffs should have expected that Defendants would incur significant postoffer expert costs. The fact that Defendants had not incurred significant costs at the time they made their offers does not render the offers lacking in good faith. We find no abuse of discretion in the trial court's consideration of the significant costs Defendants were likely to incur if the action proceeded.

Plaintiffs further contend Defendants' offers to compromise were mere token offers because they were made after a failed mediation and before significant discovery had occurred. Plaintiffs argue that without the benefit of discovery, Defendants could not have reasonably believed they had no liability. Plaintiffs do not cite to any authority, and we have found none, stating discovery is required before a defendant makes an offer to compromise. When they made their offers, Defendants knew of Plaintiffs' claims against them, had engaged counsel, and had likely evaluated their liability in preparation for mediation. "We are not obliged to ignore the reality that [Defendants] prevailed" in this case with no finding of liability. (*Jones, supra*, 63 Cal.App.4th at p. 1264.) The "result

86

itself constitutes prima facie evidence that the offer was reasonable, and the burden of proving an abuse of discretion is on appellants, as offerees, to prove otherwise." (*Ibid.*) Plaintiffs did not meet that burden.

Lastly, Plaintiffs contend they lacked information necessary to evaluate Defendants' offers at the time they were made because Plaintiffs had only portions of Elizabeth's medical records and had taken no depositions. The fact that extensive discovery had not yet occurred does not render Defendants' offers to compromise unreasonable or lacking in good faith.

We find the trial court acted well within its discretion in awarding Defendants their expert witness fees.

3. *Scaling Based on the Parties' Financial Positions*

Plaintiffs contend the trial court failed to recognize its discretion to scale down its award under Code of Civil Procedure section 998 based on the parties' financial positions.

Code of Civil Procedure "[s]ection 998 requires the amount [of a costs award] to be 'reasonable.' Given the purpose of the statute, reasonableness must be measured by considerations beyond whether it was reasonable for the offering party to have incurred the expense. . . . [T]he trial court also must take account of the offeree's economic resources in determining what is a 'reasonable' cost award. [¶] If the goal of Code of Civil Procedure section 998 is to encourage fair and reasonable settlements—and not settlements at any cost—trial courts in exercising their discretion must ensure the incentives to settle are balanced between the two parties. Otherwise less affluent parties

87

will be pressured into accepting unreasonable offers just to avoid the risk of a financial penalty they can't afford. Thus, when two competing parties possess vastly disparate economic resources, this may require the trial courts to 'scale' the financial incentives (in this instance the section 998 cost awards) to the parties' respective resources." (*Seever v. Copley Press, Inc*. (2006) 141 Cal.App.4th 1550, 1561-1562.)

Here, Plaintiffs contend the trial court did not recognize its discretion to scale down its expert fees award under Code of Civil Procedure section 998. We reject this argument. The trial court considered Plaintiffs' argument and found scaling was not appropriate because under Plaintiffs' theory, "a large entity with a high net worth would . . . never be entitled . . . to costs and that's not what the law intended. [¶] In addition to that, as a practical matter, [the court] think[s] [P]laintiffs were put on notice that this could be quite costly. And that was something that [Plaintiffs were] aware of in proceeding with this case that there would be a possibility that they would be responsible for costs. The [c]ourt has made every effort to . . . make adjustments where it could. But the bottom line is that [D]efendants are entitled to costs and they should get them." Thus, the trial court clearly recognized its discretion to scale down costs based on the parties' respective financial resources. It simply chose not to do so.

Further, we note that although the total costs award to Defendants was approximately $160,000, the trial court taxed costs where they were unreasonable or improper, and ultimately awarded expert fees in the amount of $6,000 to the Scripps Defendants, $6,000 to Dr. Ritt, $9,000 to Dr. Mehta, $6,000 to Dr. Lugo, and $3,975 to Dr. Shieh. Based on the expert-driven nature of this case and its complexity, the expert

88

fees the court awarded Defendants were reasonable and we find no abuse of discretion in the trial court's awards.

    4. *Dr. Ritt's Offers to Compromise*

Plaintiffs argue the trial court erred in holding McDermet and Christopher responsible for Dr. Ritt's expert fees. We agree.

Code of Civil Procedure section 998, subdivision (c)(1) allows a defendant who made a reasonable offer to compromise to a plaintiff that was rejected to recover from that plaintiff postoffer costs for the services of expert witnesses. The statute does not authorize a defendant to recover expert fees from a plaintiff to whom defendant did not offer to compromise. A court cannot award costs not authorized by statute. (*Perko's Enterprises, Inc. v. RRNS Enterprises* (1992) 4 Cal.App.4th 238, 243.)

Here, Plaintiffs contend Christopher and McDermet cannot be held responsible for Dr. Ritt's expert fees under Code of Civil Procedure section 998 because Dr. Ritt never served Christopher and McDermet with offers to compromise. Dr. Ritt did not respond to Plaintiffs' argument. Based on our review of the record, Dr. Ritt served offers to compromise on only Clenton and the Estate. Accordingly, the trial court erred in awarding Dr. Ritt his expert fees as against Christopher and McDermet.

## VIII. *Trial Court's Order Adding Parties*

In May 2014, Clenton, on behalf of himself and the Estate, filed the initial complaint in this action. Thereafter, the Scripps Defendants and Dr. Ritt sought protective orders to stay their depositions until all necessary parties, including all known heirs, appeared in the action and the Estate was represented by counsel. The court

89

deemed the complaint amended to add Christopher and McDermet as parties. Plaintiffs filed a first amended complaint, identifying the Estate, Clenton, Christopher, and McDermet as plaintiffs in the action.

Plaintiffs argue the trial court abused its discretion by delaying depositions until the complaint was amended to name all of Elizabeth's known heirs. We reject this argument.

"California law provides that either the heirs of a decedent, or the personal representative on behalf of the heirs, may bring a single joint indivisible action for wrongful death." (*Smith v. Premier Alliance Ins. Co.* (1995) 41 Cal.App.4th 691, 696 (*Smith*).) "Because there is only a single action for wrongful death, an heir bringing the action should join all known heirs. If an heir refuses to join as a plaintiff, he or she may be named as a defendant, so all heirs are before the court in the same action. [Citation.] However, an heir named as a defendant in a wrongful death action is, in reality, a plaintiff." (*Id.* at p. 697.)

"The court, for good cause shown, may make any order that justice requires to protect any . . . deponent . . . from unwarranted annoyance, embarrassment, or oppression, or undue burden and expense." (Code Civ. Proc., § 2025.420, subd. (b).) "[M]anagement of discovery lies within the sound discretion of the trial court." (*People v. Superior Court* (*Cheek*) (2001) 94 Cal.App.4th 980, 987.)

Here, the Scripps Defendants and Dr. Ritt sought protective orders to prevent depositions from going forward until all known heirs were added to the action. During a hearing, the trial court and counsel discussed amending the complaint, and the court

90

deemed the complaint amended to add Christopher and McDermet as parties. At the same time, the court took the Scripps Defendants' and Dr. Ritt's motions for protective order off calendar. We find no abuse of discretion in the trial court's order.

Christopher and McDermet were known wrongful death heirs, and thus were required parties to the action, either as plaintiffs or defendants. (*Smith, supra*, 41 Cal.App.4th at pp. 697-698.) If they were not added to the complaint prior to the challenged depositions, the deponents could have been subject to multiple depositions. The discussion between the court and counsel referenced in the court's order about amending the complaint was not reported. Thus, we have no basis for concluding the trial court abused its discretion.

DISPOSITION

The judgment in favor of Dr. Ritt is reversed to the extent it holds Christopher and McDermet responsible for Dr. Ritt's expert costs in the amount of $6,000. In all other respects, the judgments are affirmed. Defendants are entitled to costs on appeal.

HALLER, Acting P. J.

WE CONCUR:

O'ROURKE, J.

DATO, J.

91

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER ALEXANDER et al., <br><br>     Plaintiffs and Appellants, <br><br>     v. <br><br> SCRIPPS MEMORIAL HOSPITAL LA JOLLA et al., <br><br>     Defendants and Respondents. | D071001 <br><br><br> (Super. Ct. No. <br>  37-2014-00016257-CU-MM-CTL) <br><br><br> ORDER CERTIFYING OPINION <br> FOR PARTIAL PUBLICATION |

THE COURT:

The opinion filed April 16, 2018, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the requests pursuant to California Rules of Court, rule 8.1105(a), for publication are GRANTED, in part.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), with the exception of Parts I.D, I.E,

_____

[*]     Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of Parts I.D, I.E, II, III, IV.C, V.A, V.B.1, V.B.2, V.B.3, V.B.5, V.D, VI, VII and VIII of the Discussion.

II, III, IV.C, V.A, V.B.1, V.B.2, V.B.3, V.B.5, V.D, VI, VII and VIII of the Discussion, and is ordered published in the Official Reports.

HALLER, Acting P. J.

Copies to:  All parties